REMBOLD MOTORS, INC. *v.* GENEVIEVE I. BONFIELD.

[No. 3-1072A76. Filed March 7, 1973.]

*John E. Newby, Daniel E. Lewis, Jr., Edward L. Volk, Newby, Lewis & Kaminski,* of LaPorte, for appellant.

*Clarence T. Sweeney, Lee W. Dabagia, Patrick E. Conoghue, Sweeney, Fox, Sweeney, Winiski & Dabagia,* of Michigan City, for appellee.

SHARP, J.—This case was commenced by the Plaintiff-Appellee, Genevieve I. Bonfield, by the filing of a complaint on August 25, 1971, wherein Rembold Motors, Inc. was designated Defendant. Said complaint alleged that the Appellee as lessor had entered into a written lease dated June 30, 1969 with the Appellant as lessee. The complaint further alleged that the Appellant was in default under the term of said lease in the sum of $900.00 for rent and the sum of $630.72 for property taxes which had been demanded and payment refused. The complaint prayed for "termination of the lease, ejectment of the defendant from the leased premises, for costs in this action and for all other proper relief". A copy of the lease in question was attached to the complaint and consists of 24 numbered paragraphs covering 12 full pages in the transcript. This lawsuit centers on one of the basic provisions of the lease which provides as follows:

> "The Lessor hereby leases to the Lessee, and the Lessee hereby hires from the Lessor the following described real estate together with improvements situated thereon and thereto belonging, to-wit: (Real estate here described) for a term of five (5) years commencing on the 1st day of July, 1969, and ending on the 30th day of June, 1974, at an agreed rental of Nine Hundred Dollars ($900.00) per month together with an amount of money which may exceed the property taxes of $2,000.00 per annum payable for said demised premises commencing with taxes for the year 1969 due and payable in 1970 and continuing during the entire term of the lease, or any extensions thereof, in order that Lessee will pay such excess taxes for the entire term of occupancy. The monthly rental of $900.00 per month shall be payable in advance on the 1st day of each and every

month to the Lessor at such place as the Lessor may from time to time designate in writing."

Two other relevant provisions are paragraphs 18 and 20 which provide:

"18. No delay on the part of either party in enforcing any of the provisions of this lease shall be considered as a waiver thereof. Either party may waive the enforcement of any of the provisions of this lease and such waiver shall not constitute a waiver of the right to exercise the same at any other time."

\* \* \* \* \* \*

"20. If Lessee defaults in the payment of rent, or if Lessee defaults in any of the other covenants and agreements of this lease, or if the Lessee shall be adjudicated bankrupt or insolvent according to law, or shall make an assignment for the benefit of creditors, Lessor shall then, but not until then, have the right to sue for rent or to terminate this lease and re-enter said premises and then, and in any of said cases, the Lessor may lawfully enter into and upon the said premises, or any part thereof, in the name of the whole and repossess the same and expel the Lessee and those claiming under and through it, and remove its effects, forcibly if necessary, without being deemed guilty of any manner of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent, or preceding breach of covenant, and upon entry as aforesaid, this lease shall terminate and wholly expire, and the Lessee covenants that in case of such termination it will indemnify the Lessor against all loss of rent which the Lessor may incur by reason of such termination during the residue of the term hereof."

The lease proceeds in a detailed fashion to describe various rights and obligations of the parties under it.

On the 3rd day of November, 1971 the Appellant filed an answer to the Appellee's complaint explicitly setting out three defenses. The first defense asserted that the complaint failed to state a claim upon which relief could be granted. The second defense admitted the allegations of the complaint with reference to the execution of the lease but denied the allegations of the complaint with reference to the default. The third defense alleged:

"Plaintiff has accepted rent allegedly delinquent and taxes allegedly payable have been paid or tendered whereupon the plaintiff has waived alleged defaults complainted [sic] of in this action."

Thereafter on the 11th day of November 1971 the Appellant filed a supplemental answer asserting a fourth defense as follows:

"That since the defendant's Answer was filed herein on or about November 3, 1971, defendant has discovered that checks given by it to the plaintiff, Genevieve I. Bonfield, or her attorneys, at various times since August 1, 1971 have apparently not been presented for payment and that these checks aggregate Four Thousand Two Hundred Thirty Dollars and Seventy-two Cents ($4,230.72).

Defendant further says that all of said checks were tendered in good faith and in the manner heretofore acceptable to the plaintiff as payment for rentals due and none of the same have been returned to it or their receipt declined by plaintiff nor has defendant been notified that the same were not negotiated; further, that the tender by the defendant of said checks having been in good faith removed any delinquency or default under the Lease attached to the Complaint of the plaintiff as Exhibit 1 but that defendant has relied to its detriment upon the acceptance and retention of said checks for all amounts due under said Lease.

Defendant as of November 10, 1971 has learned that plaintiff has negotiated and executed a Lease of the premises demised to it with a third party without the knowledge of the defendant and without the completion of this litigation. In order to protect its position the defendant, therefore, tenders into Court by paying into the Clerk's Office coincident with the filing of this Supplemental Answer the sum of Four Thousand Two Hundred Thirty Dollars and Seventy-two Cents ($4,230.72) which is the amount of the following checks received by the plaintiff as indicated:

| | | |
|---|---|---|
| Check No. 10875, dated August 24, 1971 | | $900.00 |
| Check No. 10922, dated September 13, 1971 | | 900.00 |
| Check No. 11014, dated October 4, 1971 | | 900.00 |
| Check No. 11098, dated October 31, 1971 | | 1,530.72 |

Plaintiff is estopped, therefore, to assert any provisions of the Lease with defendant which are inconsistent with plaintiff's conduct in accepting and retaining the checks of the defendant as previously stated and from complaining and obtaining relief by virtue of those complaints for al-

leged prior failure to make payments under said Lease. Further, that all of the actions of the plaintiff in retaining the tendered checks and entering into a Lease Agreement with a third party were covert and resulted in defendant, a business corporation, being placed in an injured position as a result of its reliance upon the apparent fact that any alleged breaches of the Lease had not been cured by payment."

On the 3rd day of March, 1972 the Appellee filed her Motion for Summary Judgment asserting that "the pleadings, exhibits, affidavits and deposition on file show that there is no genuine issue as to any material fact and that Plaintiff is entitled to judgment as a matter of law." By way of affidavit four letters dated January 14, 1971, March 22, 1971, July 21, 1971 and August 5, 1971 addressed to the Appellant from the attorney for the Appellee were put before the trial court. The one of principal relevance here was dated August 5, 1971 to the Appellant from Appellee's lawyer and reads as follows:

"My communication addressed to you under date of July 21 concerning delinquent rent remains unanswered.

I respecfully refer you to the lease executed on June 30, 1969, which, among other things, provides for the prompt payment of rent on the first day of each and every month. Your failure to pay the rent for the month of December creates a default on your part under the provision of the lease. I further respectfully refer you to the provisions of the same lease wherein the lessee is obliged to reimburse the lessor for the amounts paid in property taxes which exceed $2,000 per annum commencing with the year 1969, with taxes payable in 1970. The excess over $2,000 for 1969 amounts to $145.70. The excess taxes over $2,000 for the year 1970 amounts to $485.02. Property taxes are payable on or before the first Monday in May, but there is a provision that permits one-half of the payment to be made in May and the remaining one-half to be made in November. Accordingly, for the year 1969 and 1970, the total excess taxes over $2,000 amount to $630.72. You therefore, are delinquent for rent and taxes in the amount of $1,530.72, and Mrs. Bonfield has given me definite instructions to institute suit for collection of these items unless payment is re-

ceived in full on or before the 23rd day of August, 1971. I hope court action may be avoided."

Likewise, the trial court had before it the deposition of James P. Rembold who was identified as the owner of Appellant Rembold Motors, Inc. This deposition was taken at the instance of the Appellee. Some of the relevant testimony of James P. Rembold questioned in the deposition by counsel for the Appellee is as follows:

"Q Now, during the term of the lease that commenced on June 30, 1969, on what day of the month were you making your rental payments?
A Well, somewhere around the first of each month.
Q Did you continuously make all of your rental payments on or about the first of the month throughout the term of the lease agreement since it began on June 30, 1969?
A With one exception.
Q And what was that exception?
A I got a month behind in January of '71, I guess it was.
Q When you say you got a month behind in January of '71, am I to take that you did not pay the January rental?
A Not for thirty days. I was thirty days late.
Q When you say you were thirty days late, did you pay it on or about the first day of February?
A I believe that is right.
Q Was that made in addition to the February rental?
A No.
Q Well, when did you pay the February rental then?
A Well, I ran about thirty days late for several months."

* * * *

"Q Mr. Rembold, are you aware of an obligation placed upon Rembold Motors, Inc., to pay property taxes in the event the property taxes increase above a certain base limit?
A Yes.
Q Did you, at any time, from June 30, 1969, to the date of filing the lawsuit, pay any property taxes as part of

the rent or in addition to the stipulated monthly rental amount of nine hundred dollars?

A  I didn't pay it nor was I advised that I owed it."

\* \* \* \*

"Q  Do you recall requesting, at any time, an extension or an allowance of additional time to bring current that delinquency to avoid litigation on the question of the delinquent rent?

A  I talked to Mrs. Bonfield one time and explained my situation. I never anticipated any litigation."

\* \* \* \*

On cross-examination by his own counsel Mr. Rembold testified in relevant part as follows:

"Q  Did there come a time when you transmitted checks in payment of your rent after you received the August fifth letter from Mr. Sweeney?

A  You will have to repeat that.

Q  After you got the August fifth letter from Mr. Sweeney, did you send him any money?

A  I have sent checks every month for the rent. Of course, then I did send the check for nine hundred dollars plus the sales tax—I mean the property tax, which amounted to $1,530.72.

Q  And that last check for that fifteen hundred dollars—

A  One thousand five hundred thirty.

Q  Who did you send that to?

A  Mrs. Bonfield.

Q  Was the check returned to you?

A  No.

Q  Were there any checks returned to you that you sent to Mr. Sweeney after his August fifth letter?

A  No.

Q  Did they tell you they weren't accepting the rent—either Mr. Sweeney or Mrs. Bonfield?

A  No.

Q  What is the situation as to whether or not Mrs. Bonfield ever came on you[sic]premises after-either immediately before, or at any time—and demanded the

possession of the premises from you? Did she ever do that?

A She never has.

Q Did you [sic] agent acting in her behalf do that?

A No.

Q Of the amounts demanded in this lawsuit, which is nine hundred dollars plus the amount they claim due for the taxes of $630.72, has that money been paid?

A Yes.

Q Is it true that that money was paid to Mrs. Bonfield by check?

A Right.

Q Now, did you subsequently learn that these checks that were transmitted to Mr. Sweeney or Mrs. Bonfield were not cashed?

A I did.

Q When did you learn that?

A After a friend of mine had advised me that they had entered into a lease agreement with another company here in town and I checked on it and found that the checks had not cleared.

Q Now, at that time, what did you do about, if anything, about paying any money to anybody to back up the checks that they had not cashed?

A When that happened, on your advice, I made a check for—a certified check to the Circuit Court—was it the Circuit Court?

Q Well, you remember it as best you can.

A Circuit—I always get the name wrong—The Clerk of the Circuit Court—I believe it was, and submitted the check for the total amount of the rent covering those checks that were not cashed.

Q Now, at all times when those checks were outstanding that you had sent to Mr. Sweeney or Mrs. Bonfield, was there adequate funds in your account to cover them?

A Oh yes.

Q Did there come a time after you paid the money into the Clerk's office when you took any action with respect to the outstanding checks that you learned were not cashed?

A A short time later, I stopped payment on those checks.

Q  That was after you tendered the money into court?

A  Yes.

Q  By certified check?

A  Right.

Q  Now, how may [sic] years have you paid rent to Charles Bonfield and then to Mrs. Bonfield, either as the executrix of her husband's estate or in her individual capacity?

A  Approximately, fourteen years.

Q  Now, when was it, in time, that you learned that the checks you had been tendering for rent were not being cashed?

A  I think sometime in November.

Q  Of what year?

A  '71.

Q  Now, during the period between the date of the filing of this lawsuit, which the record shows as August 25, 1971, and that date in November when you got this information, did you take any steps to make arrangements to get other quarters for you [sic] business?

A  No.

Q  And was there a reason for this?

A  I had no reason to look for a place. I felt I have a valid lease until June of '74.

Q  Now, when you found out about this in November of 1971, what is the situation as to your ability, at that time, to make other arrangements regarding housing for your business?

A  It is pretty late in the year to be thinking of building any facilities and to may [sic] knowledge, there are no ready-made facilities available in this town.

Q  Now, from the date of the commencement of this lawsuit until the present time, has Mrs. Bonfield spoken to you or have you spoken to her in any way?

A  No.

Q  This would include the fact, then, that the communications you have had with her have all been in writing?

A  From the time of this lawsuit?

Q  Yes.

A  Yes.

Q And these communications consisted of what?

A Well, that I was advised that they were suing.

Q No, the communications you had with Mrs. Bonfield.

A I haven't has [sic] any with Mrs. Bonfield.

Q Did you write her a letter sending her a check?

A Yes.

Q Other than that, have you had any?

A No.

Q Now, have you ever had a demand for possession of this property from either Mr. Sweeney, her attorney, or Mrs. Bonfield?

A No."

The trial court also had before it the deposition of the Appellee taken at the instance of the Appellant. Some of the relevant deposition testimony of the Appellee is:

"Q Now, after January of 1969, when you became the owner of that property, which is the subject of this lease, did you have occasion to visit the property?

A Yes.

Q And when did you visit it?

A I don't keep dates of when I visit my properties, any of them.

Q To the best of your recollection, when was it?

A I visited the property in question between January of 1969 and August of 1971 many times.

Q And did you go alone when you made these visits?

A Yes.

Q What was the occasion of your going on the various occasions?

A I had many reasons to go. First, to be sure that the John Deere Company had finally moved. They were late, and secondly, to be sure that Mr. Rembold had arrived in the entire property and I stopped in to check the wind damage, when, I believe, a window was broken and so forth.

Q Were there any other visits after the implement company moved out, then, for the purposes you mentioned?

A Yes.

Q When was that and what was the occasion?

A The occasion was because rent was late.

\* \* \* \*

A . . . and I stopped in, I believe, once or twice, when rent checks were late from Mr. Rembold.

Q Did you get the rent checks?

A Never—once, yes. Once, I'm sorry.

Q You mean while you were there?

A I'm not sure whether it was handed to me or whether it was told it would be sent in the mail that day. I had one positive experience.

Q What was that?

A When I went over regarding rent and I did get a positive answer, whether it was mailed that day or whether it was handed to me I don't recall. There was once."

During the taking of that deposition Appellee refused to answer certain questions propounded to her by Appellant's lawyer. Pursuant to TR. 30(C) and TR. 37(A) Appellant certified the questions and objections to the trial court and applied to the court for an order compelling answers to the questions so propounded. This was pending before the trial court at the time of the entry of summary judgment and was not explicitly ruled on. In the supplemental answer setting up a Fourth Defense it was alleged that Appellee was negotiating with a new tenant for a lease on the premises leased to Appellant. Appellant is attempting to show that Appellee had waived a default by Appellant and waived her right to claim forfeiture for such default but then changed her mind after another tenant became available.

The trial court granted Appellee's motion for summary judgment after which Appellant filed motion to correct errors which was overruled, resulting in this appeal.

We must examine some of the salient features of substantive contract law as it pertains to forfeiture, waiver and estoppel and then test the record here in light of the now accepted principles of summary judgment law in Indiana.

As a preliminary matter we must determine whether the Appellant has adequately pleaded the defenses of waiver and estoppel. In *Schill* v. *Choate* (1969), 144 Ind. App. 543, 247 N.E.2d 688, 696, it is stated:

> "When an estoppel is relied upon, it must be pleaded with particularity and precision, with every essential fact being set forth, for nothing can be supplied by inference or intendment and, indeed, if there is any ground for inference or intendment, it will be against and not in favor of estoppel."

It must be remembered that the statement in *Schill* was based on an interpretation of the civil rules in effect before January 1, 1970. Under the present Indiana Rules of Procedure TR. 8(C), 8(E)(1) and 8(F) are relevant. TR. 8(C) provides:

> "A responsive pleading shall set forth affirmatively and carry the burden of proving: Accord and satisfaction, arbitration and award, discharged in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, lack of jurisdiction over the subject-matter, lack of jurisdiction over the person, improper venue, insufficiency of process or service of process, the same action pending in another state court of this state, and any other matter constituting an avoidance, matter of abatement, or affirmative defense. A party required to affirmatively plead any matters, including matters formerly required to be pleaded affirmatively by reply, shall have the burden of proving such matters. The burden of proof imposed by this or any other provision of these rules is subject to the rules of evidence or any statute fixing a different rule. If the pleading mistakenly designates a defense as a counterclaim or a counterclaim as a defense, the court shall treat the pleading as if there had been a proper designation.

TR. 8(E)(1) provides:

> "Each averrment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required. All fictions in pleadings are abolished."

TR. 8 (F) provides:

"All pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points."

The comment of the Civil Code Study Commission gives helpful insight to the purposes and application of Rule 8:

"As in the case of the initial complaint, prior practice required each paragraph of an affirmative defense to state the ambit of essential facts constituting the defense. Those facts had to provide the substantive legal theory upon which the pleader expected to proceed. Under Rule 8(c), the general rules of pleading applicable to the statement of a claim also apply to the statement of a defense. See comment to Rule 8(a). The defense may be pleaded in general terms and is sufficient so long as it gives the plaintiff fair notice of the nature of the defense."

We hold that the allegations of the Appellant's answer and supplemental answer are, on their face, sufficient to permit it to prove the facts necessary to sustain its defenses of waiver and estoppel. This is especially true in the context of this summary judgment proceeding since the Appellant is entitled to have the pleadings liberally interpreted in its favor. *Wozniczka* v. *McKean* (1969), 144 Ind. App. 471, 247 N.E.2d 215 and *Doe* v. *Barnett* (1969), 145 Ind. App. 542, 251 N.E.2d 688.

After examining the pleadings, affidavits and depositions in the light most favorable to the Appellant we must next determine whether the Appellee was entitled to a judgment as a matter of law or whether there was any genuine issue of material fact.

The often expressed judicial attitude toward forfeiture was stated succinctly by the Appellate Court in *Clayton* v. *Fletcher Savings and Trust Co.* (1927), 89 Ind. App. 431, 155 N.E. 539, 543:

"Forfeiture is a harsh remedy, not favored in equity, and must yield to the principle of compensation where fair

dealing and good conscience seem to demand. Where a party by his indulgence has waived the provision of a contract making the time of payment of money of the essence of the contract, and temporarily suspends the right to declare a forfeiture, such right can be resumed only by giving a definite and specific notice to that effect."

See also, *Whitcomb* v. *Indianapolis Traction and Terminal Co.* (1917), 64 Ind. App. 605, 116 N.E. 444.

In regard to the possible legal implications of accepting payments on days later than the date specified in the contract, the court in *Heitz* v. *Knox County Home Tel. Co.* (1910), 46 Ind. App. 485, 92 N.E. 1040, 1042, said:

"From such conduct on the part of the appellants it may be fairly inferred that the time of payment was not considered of the essence of the contract.

Payment of the rent for the month in question was offered and refused before the commencement of this action. No objection was made as to the form of tender being by check, but the acceptance of payment was absolutely refused. There is evidence warranting the conclusion that appellants waived their right to insist on forfeiture as to this month."

In regard to the defenses of waiver and estoppel in a lease case factually similar to this one, a unanimous Supreme Court, speaking through Justice DeBruler, in *Lafayette Car Wash, Inc.* v. *Boes* (1972), 258 Ind. 498, 282 N.E.2d 837, 840, said:

"If lessors had accepted a late payment of the July rent they would have waived their right to terminate the lease because of failure to pay the July rent on time. As far as waiver doctrine is concerned this would not have prevented them from terminating for subsequent defaults in the rent payments. However, if lessors' past acceptance of late rent payments had induced the vendees to neglect to pay the rent on the first of July when otherwise they would not have neglected to do so, lessors would be estopped from terminating the lease without notice on the grounds of late payment."

In the same vein Judge Cooper, speaking for the Appellate Court in *Snyder* v. *International Harvester Credit Corp.* (1970), 147 Ind. App. 364, 261 N.E.2d 71, 75, said:

> "Thus, when appellee accepted payments made by appellant on July 20 and August 11, it recognized the contract as still in effect and waived any right it might have had for foreclosure. Not only did appellee continue to receive payments from appellant, but it never made any tender back to appellant of money allegedly conditionally received from him. We therefore conclude that appellee, by receiving appellant's payments, did reinstate the contract; . . . ."

One of the legal obligations which may flow from acceptance of payments at irregular times was defined in *Chambers* v. *Boatright* (1961), 132 Ind. App. 378, 177 N.E.2d 600, 603, as follows:

> "We are of the opinion that in view of appellants' consistent acceptance of payments by appellees at irregular times and in irregular amounts, as we have heretofore said is revealed by the record evidence before us, the appellants were required to give appellees personal notice of their intention to forfeit the said contract."

As a general rule the retention of a check under circumstances implying that it is accepted as payment discharges the debt. See 70 C. J. S., *Payment*, § 24. See also *Cook & Bernheimer Co.* v. *Hagedorn* (1921), 82 Ind. App. 444, 131 N.E. 788, and *Northwestern Mutual Life Insurance Co.* v. *Kidder* (1904), 162 Ind. 382, 70 N.E. 489. The conduct of the Appellee in regard to accepting late payments and in the retention without negotiation of tendered rent checks raises a basic question of her intent. Much of the concept of waiver and estoppel centers around the question of intent. We have repeatedly said where there is a question of state of mind, weight of testimony, or credibility of witnesses, summary judgment should be denied. *Mayhew* v. *Deister* (1969), 144 Ind. App. 111, 244 N.E.2d 448.

It is unnecessary to burden this opinion with a restatement

of the legal principles governing summary judgment. They were recently restated in *Ross* v. *Farmers Insurance Exchange* (1971), 150 Ind. App. 428, 277 N.E.2d 29.

Of particular relevance here is the recent statement of Judge Robertson in *Watson* v. *Tempco Transportation, Inc.* (1972), 151 Ind. App. 644, 281 N.E.2d 131, 134:

> "However, in the instant case, while the basic facts do not appear to be in dispute, there nonetheless is genuine disagreement between the parties as to the inferences to be drawn from those facts. It is well settled in the federal courts that where there exists a good faith disagreement as to the inferences to be drawn from the facts summary judgment is not proper. Hart v. Johnston (6th Cir. 1968), 389 F. 2d 239; Massengale v. Transitron Electronic Corp. (1st Cir. 1967), 385 F. 2d 83; Williams v. Pacific Maritime Association (9th Cir. 1967), 384 F. 2d 935; Moran v. Bench (1st Cir. 1965), 353 F. 2d 193.
>
> The federal rule was followed by this Court in Wozniczka v. McKean, et al. (1969), 144 Ind. App. 471, 247 N.E.2d 215:
>
> > 'A case is not one to be decided on summary judgment where, though the basic facts are not disputed, parties in good faith may nevertheless disagree about inferences to be drawn from the facts.' " See also *Kochert* v. *Wiseman* (1971), 148 Ind. App. 613, 269 N.E.2d 12.

Examined in light of the above stated principles of substantive and summary judgment law we cannot say that the Appellee is entitled to summary judgment as a matter of law. It is possible that the trier of fact might draw inferences favorable to the Appellant on its alleged defenses. This is a case which should be tried on its merits by use of the truth seeking procedures of a regular civil trial.

Since this case must be remanded we should dispose of one additional pending issue. That is the question of the request that Appellee answer certain questions, above described in her deposition. The standard for the proper scope of discovery is found in TR. 26 (B) (1) which provides:

> "Unless otherwise ordered by the court in accordance with these rules, the scope of discovery is as follows:

(1) In general. Parties may obtain discovery regarding any matter not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Since the Indiana version of Rule 26(B)(1) is patterned after Federal Rule 26, the authorities on the latter are relevant. In 8 Federal Practice and Procedure, Wright and Miller, § 2011, p. 94, it states in part:

"Thus a party is not required to have the affirmative of the issue upon which he seeks discovery. Most state practices now are to the same effect although this has not always been the case. Plaintiff is as free to seek information relevant to a defense as he is to seek matter relevant to his own case. A third party defendant may examine plaintiff although neither party asserts a claim against the other. . . . Finally, a party is entitled to seek discovery on his theory of the facts and law, and is not limited in discovery by his opponent's theory."

The questions with reference to the requested discovery should have been disposed of before the trial court ruled on the motion for summary judgment. The trial court should rule on the pending discovery matters under the above guidelines.

This case is reversed and remanded to the trial court with instructions to rule on the discovery matters requested by the Appellant and to proceed to determine this case on its merits.

Hoffman, C.J. and Staton, J., concur.