WILLIAM J. PIERCE AND GENEVIEVE J. PIERCE *v.* ALOYSIUS H. YOCHUM AND HELEN A. YOCHUM.

[No. 1-774A109. Filed June 12, 1975. Rehearing denied July 14, 1975. Transfer denied December 30, 1975.]

---

*Charles S. Gleason, Watson, Gleason & Hay,* of Indianapolis, for appellants.

*Robert V. Kixmiller, Shake, Lewis, Kixmiller & Sturm,* of Vincennes, for appellees.

LOWDERMILK, J.—Plaintiffs-appellants (Pierces) bring this appeal from a judgment denying their claim for ejectment and damages.

The facts pertinent to this appeal establish that the Pierces, as sellers, and the defendants-appellees (Yochums), as buyers, entered into a contract for the sale of certain real estate. The contract was entered into in August, 1966, and the contract price was $150,000.00.

The Yochums were granted initial credits of $500.00 and $5,000.00 for various reasons and were to make yearly payments of $10,000.00, due on or before December 1st of each succeeding year.

The payments made by Yochums on the contract were often irregular in time and amount; payments being early or late and usually in amounts less than $10,000.00. This payment procedure continued until March of 1971 when the Yochums received a note from the Pierces requesting additional payment on the 1970 contract obligation.

On March 29, 1971, the Pierces mailed a letter to the Yochums stating that $4,000.00 was due on the 1970 obligations and that approximately $1,300.00 was delinquent on the real estate taxes. This letter demanded full payment and advised Yochums that the contract was terminated.

Following this letter to Yochums the parties discussed the contract problems and obligations in various personal meetings and through numerous letters written by themselves and their attorneys. There is evidence that the Yochums remained on the property as lessees; and there is evidence that the Yochums were under the impression they could remain on the property under the original contract. There is further evidence that both the Pierces and the Yochums were seeking additional financing to complete payment of the contract, and that Dr. Pierce was particularly interested in Yochums completing purchase of the property.

In October of 1971 the Pierces accepted the sum of $8,000.00 from Yochums, and in November of 1971 Yochums paid the

sum of $2,000.00. These payments were entered by Dr. Pierce in his records as payments under the contract, and the sums were subtracted from the outstanding balance.

Although other facts will be discussed more fully below, on January 12, 1972, the Yochums received a letter from counsel for the Pierces, demanding that the real estate be vacated. The suit for ejectment was filed on March 12, 1972, and the final order and judgment of the court was that Pierces recover nothing by way of their complaint.

At the outset, we find it necessary to set out the standards of appellate review which guide us in considering this appeal. The Pierces failed to carry their burden of proof in the trial court. Thus, they appeal a "negative judgment" and, therefore, in addressing the various arguments, we not only consider the evidence most favorable to Yochums, but can reverse only if we find the judgment contrary to law. *VerHulst* v. *Hoffman* (1972), 153 Ind. App. 64, 286 N.E.2d 214; *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N.E.2d 669. The judgment below will be considered contrary to law only where the evidence leads to but one conclusion and the trial court reached an opposite conclusion. *Pokraka, supra; Apple* v. *Apple* (1973), 158 Ind. App. 7, 301 N.E.2d 534. Stated differently, the decision may be contrary to law where it clearly appears reasonable men could not have reached the conclusion of the trial court. *Senst* v. *Bradley* (1971), 150 Ind. App. 113, 275 N.E.2d 573.

I.

Pierces first contend that the evidence leads to the inescapable conclusion that Yochums were in default on the contract payments.

At the center of the controversy over the delinquent payments is paragraph number seven of the purchase contract:

"7. In the event that the Buyers have a total crop failure or a substantial crop failure they shall be relieved of the obligation of making said yearly payments, however, the Buyer shall be obligated to pay at least fifty per cent of the interest accruing in any such year but any unpaid interest

shall be added to and become a part of the unpaid purchase price."

In 1970, Yochums paid the sum of $6,000.00 on the contract, and tendered no other payments for that year. On March 29, 1971, Dr. Pierce wrote Yochums and informed them of an alleged $4,000.00 deficiency in payments.[1] Pierces contend it is this failure that constitutes a breach of the contract allowing termination and forfeiture.

It is Yochums' contention that in 1970, they experienced a crop failure which would thus activate the provisions of the above paragraph number seven. Yochums argue that the $6,000.00 was more than sufficient to pay one-half of the interest for 1970, and that, therefore, there could be no failure of payment.

Procedures for determining if there had been a crop failure are set out in the contract, to-wit:

"8. The determination of whether or not the Buyers suffer a total crop failure shall be determined by the following individuals:
(a) The Knox County County Agent
(b) The Farm Representative of the American National Bank
(c) Harvey K. Ramsey, Attorney at Law
The Buyers and Sellers agree that they will accept and abide by the decision of a majority of the three (3) aforesaid individuals and waive the right to appeal said decision to a Court of Law."

Pierces contend there was no evidence whatsoever showing that there was a total or substantial crop failure, and that Yochums cannot rely on other allegations concerning the crop failure.

We would agree with Pierces that there is no report, as such, in the record which states that there was a crop failure on the land involved. Further, there appears to be no testimony by any of the persons indicated above, who were to make the final determination.

There is, however, testimony by the parties litigant which

---

1. Other parts of the same letter will be discussed below.

negates the Pierces' arguments in this regard. We note the following questions and answers during the direct examination of Dr. Pierce:

> "Q. Dr. Pierce, there was—it has been determined pursuant to the contract by arbitrators, that the purchaser defendant had a substantial crop loss in the year, 1970, is that correct?
>
> A. That is correct.
>
> Q. And consequently the purchaser for the year, 1970, as of December 1, 1970, owed only one-half of the interest due up to that time. Is that correct?
>
> A. That's correct."

Further, from the direct examination of Aloysius Yochum, we note the following:

> "Q. What was your reaction or what did you do, Mr. Yochum, when you received this letter of March 6, 1971, asking you to make a payment on 1970 contract?
>
> A. If I may recall right, I talked to Dr. Pierce, he can verify everytime I got a letter from him, I went and seen him, I was mad enough to go see him and I told him over here, I had never refused of ever seeing him.
>
> Q. Well, did you see him after you got this letter?
>
> A. Yes, sir. I told him we had a crop failure, he said, "I agree, you had a crop failure." He did too on his farm over there. So I referred, you know, talked to O. K. Anderson and he agreed with me; we had a crop failure."

We view this testimony in light of the express terms of the contract. Paragraphs seven and eight, *supra,* make no provision for a written report by the three named individuals. The parties agreed in the contract to abide by the *"decision* of the majority;" the contract does not say that a physical report must be submitted for consideration or approval by the parties. Given the lack of any requirement for a written report concerning a crop failure, and Dr. Pierce's admission that there was, in fact, a determination of a crop failure, we conclude there was no default in payment for the year 1970, and that the trial court's finding in this regard was not contrary to law.[2]

---

2. Testimony by Dr. Pierce established that one-half of the interest for 1970 was approximately $4,150.00. Thus the $6,000.00 tendered by Yochums was clearly sufficient.

## II.

Pierces raise a second argument with regard to the 1970 payment. It is Pierces' contention that even if the $6,000.00 was paid by Yochums in 1970, and even if only approximately $4,150.00 was owing for that year, Yochums were still in default by approximately $1,150.00 because of a prior default in payment. This argument of Pierces' is based on paragraph number eleven. This paragraph sets out the required amounts of insurance, and then states:

". . . In the event that any of said structures sustain loss covered by aforesaid insurance then the proceeds of said insurance shall be applied to the repair or restoration of said structures. If any of said structures are totally destroyed or damaged so extensively that the repair or restoration of the same is not practical in the opinion of the Sellers, then the proceeds of said insurance shall be applied to the unpaid purchase price."

There is no provision in this or any other paragraph which directs *when* the money not expended for reconstruction "shall" be applied to the contract price.

It is without dispute that there was a fire in 1968 which destroyed a barn on the property. The Pierces collected the $3,000.00 and elected *not* to rebuild. Thus, under the contract, the money had to be applied against the balance.

The Pierces contend that the insurance proceeds cannot be credited against the price until the purchase is *completed*. They argue that the insurance policy and proceeds do not run with the land, but are personal to them. Further, it is argued that the insurance proceeds are security for the full performance of the contract by Yochums. Assuming the validity of these arguments, the Pierces maintain that the Yochums paid only $7,000.00 in 1968, thus leaving a $3,000 deficiency. Pierces then complete the argument by contending that inasmuch as the deficiency was not corrected before 1970, it carried forward to that year. Thus, it is maintained that there was due in 1970 $4,150.00, approximately, on the interest

for that year, plus $3,000.00 to correct the 1968 deficiency. Therefore, even though $6,000.00 was paid in 1970, there remained a default in the amount of approximately $1,150.00.

It is, of course, Yochums' contention that they received credit for the $3,000.00 in 1968, and that, therefore, the payment of $7,000.00 in that year fulfilled all contractual obligations: In support of their position, Yochums place much emphasis on past credits allowed by the Pierces, arguing that the past transactions indicate a crediting of funds *at the time the credit arose.*

A final determination of this particular issue requires an examination of the governing contract provision. As noted, it is readily apparent that paragraph number eleven, *supra,* does not say *when* credits are to be applied. The contract itself being ambiguous, we turn to well established principles of contract law. As a general rule, we note the following language from *The Illinois Pipe Line Co.* v. *Brosius* (1938), 106 Ind. App. 390, 20 N.E.2d 195:

> "Contracts should neither, on the one hand, be so narrowly or technically interpreted as to frustrate their obvious design nor, on the other hand, be so loosely or
> [2] inartificially interpreted as to relieve the obligor from a liability fairly within the scope or spirit of their terms. Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument in a legal view, if the intention of the parties can be clearly discovered, the court will give effect to it and construe the words accordingly. This does not mean that the courts should attempt to ascertain the actual mental process of the parties to a particular contract, for the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest. In ascertaining or arriving at the intention of the parties, we are not unmindful of the rule that the interpretation of an agreement does not include its modification or the creation of a new or different contract. The courts have no right to make a contract for the parties. . . ."

Further, in the case of *Ketcham, et al.* v. *Brazil Block Coal Co.* (1883), 88 Ind. 515, 529, our Supreme Court stated:

". . . where there is uncertainty, obscurity or ambiguity in the language, then *the acts of the parties in connection therewith furnish valuable aid in the construction of it. Morris* v. *Thomas,* 57 Ind. 316, 322; *Heath* v. *West,* 68 Ind. 548. Evidence of the mutual acts of the parties to the contract in reference to the fulfilment of it, after it was entered into, is admissible to show what their intention and understanding was in the use of language otherwise somewhat obscure. *Bates* v. *Dehaven,* 10 Ind. 319; *Reissner* v. *Oxley,* 80 Ind. 580." (Emphasis added.) See also, *Lacy* v. *White* (1972), 153 Ind. App. 504, 288 N.E.2d 178; *Heath* v. *West, et al.* (1879), 68 Ind. 548, 556.

In applying these above principles, we do not deny the general validity of the Pierces' arguments regarding the personal nature of insurance contracts. However, such general concepts can be changed by express contractual provisions. Hence, we view the problem as contractual interpretation, rather than indemnification per se. There is no question that the proceeds were for the Pierces' benefit in the first instance. However, the land contract acted on those proceeds *after* they were paid, and there lies our main concern.

In hope of divining the true intentions of the parties we look to their conduct during the course of the contract. Conveniently, we find the conduct of the parties reflected, at least to some degree in the records kept by Dr. Pierce. We find the following annotated record of payments revealing:

$150,000.00 land purchase contract between W. J. Pierce and A. H. and Helen Yochum, dated Aug. 31, 1966—including cattle, personal property and the Pierce share of the standing 1966 crop from this land.

| Payment and date due Pierce | Payment made by Yochum | Interest | Balance $150,000.00 |
|---|---|---|---|
| Aug. 31, 1966 $500.00 | Aug. 31, 1966 $500.00 | | $149,500.00 |
| Aug. | Aug. 31, 1966, Credit allowed for not accepting cattle $5000.00 | | $144,500.00 |

| | | | |
|---|---|---|---|
| Dec. 1, 1966 $10,000.00 | none I did not charge extra interest Dec. 10, 1966 | | |
| | actually due because of default in payment | $2104.00 | $146,604.00 |
| | Dec. 10, 1966 $4000.00 | | $142,604.00 |
| Dec. 1, 1967 $10,000.00 | none | | |
| | Dec. 1, 1967 | $8297.76 | $150,901.76 |
| | Dec. 12, 1967 | $ 272.80 | $151,174.56 |
| | Dec. 12, 1967 Credit of $2500.00 allowed, I can't remember why | | $148,674.56 |
| | Dec. 12, 1967—$3500.00 | | $141,174.56 |
| | May 11, 1968 | $3456.80 | $144,631.36 |
| | May 11, 1968 Barn burned decreasing capital asset—Insurance payment $3000.00 | | $141,631.36 |
| Dec. 1, 1968 $10,000.00 | none | | |

In addition to Dr. Pierce's own records above, we note his summary of payments sent to Yochums after December, 1971.[3]

It is true, as Pierces contend, that the insurance proceeds of $3,000.00 are labeled in Dr. Pierce's personal records as compensation for a fire loss which had the effect of "decreasing [a] capital asset." There is no such notation in the summary sent to Yochums. Rather, the $3,000.00 is labeled "paid." We note, however, that on both sheets, the amount of the proceeds was deducted from the balance *in 1968*.

It is our conclusion that there was no default in 1968, because the parties did in fact consider the insurance proceeds a credit for *that* year. This interpretation of the contract is consistent with Dr. Pierce's practice as reflected by his own records. We note that in 1966 a credit of $5,000.00 was allowed and in 1967, a credit of $2,500.00 was allowed. In both instances the credit was subtracted from the balance at the

---

3. The horizontal lines separating the transactions by year have been added.

time the credit arose. We do not equate insurance proceeds with the other credits in all respects; however, we feel these records are a strong indication that credits *of whatever nature* were deducted from the balance *when they were granted.*

In addition to the above records, we again take note of Dr. Pierce's testimony, elicited by his counsel on direct examination:

"You may answer now, Doctor.

A. If payments have been made on December 1st of each year, the balance on December 1st, 1970, would be $126,102.71.

Q. In arriving at that balance, Dr. Pierce, did you deduct from the purchase price, the $3,000.00, received from fire loss?

A. Yes."

Finally, in this regard, it is clear that no demand for payment over the $7,000.00 *actually* paid in 1968 was made in that year or the next. In fact, it appears no demand was made for late payments until the initial demand in 1971.

In light of all the above considerations, we conclude that there was no default in 1968, and that such alleged default did not, and could not, carry forward to 1970.

### III.

The Pierces lastly argue that there was a default by Yochums because of a failure to timely pay property taxes as required by the contract. The Pierces maintain that in March of 1971, there were delinquent taxes and penalties against the property, and that in June of 1971 they received a notice of a tax sale for the property involved. This, it is argued, is proof of a breach of the contract, which is sufficient to allow termination thereof.

The Yochums do not dispute that there were delinquent taxes in March of 1971, and they could not do so in good faith as the record clearly reveals the following admission:

"Q. Mr. Yochum, during the year 1971, there were delinquent taxes on this real estate, is this correct?

A. That's right."

It is Yochums' contention, however, that they paid all taxes *of which they were aware* on March 10, 1971. Although Yochums admit that additional taxes were due *after* March 10,

1971, they claim they were unaware of such delinquencies until the notice of the tax sale was forwarded to them by Dr. Pierce in June of 1971. Yochums maintain that they paid *all* delinquencies on June 29, 1971, and that Pierces must now show that as a matter of law such facts entitled Pierces to terminate the contract.

The pertinent paragraphs from the contract are as follows:

"3. The Sellers shall be liable for and shall pay all taxes, both real and personal, against the property which has become due and payable during the year 1966 and prior thereto and the Buyer shall be liable for and shall pay all taxes, both real and personal, on said property which become due and payable in the year 1967 and thereafter."

"18. In the event that the Buyers should fail to keep the taxes on the premises current or fail to keep the structures on the premises insured as aforesaid then the same at the option of the Sellers may be considered as a subsequent breach of the contract and grounds for terminating same, or the Sellers may pay any delinquent taxes or pay the insurance premiums and any sums so expended by the Sellers shall bear interest at the rate of eight (8) per cent per annum and shall become a part of the unpaid purchase price."

In addition, Pierces emphasize the following paragraph:

"16. The failure of the Sellers to exercise any option herein granted them upon any given default of the Buyers shall not constitute a waiver of their rights to exercise said option or options upon subsequent default of the Buyers."

This last paragraph is asserted to support the argument that the Yochums could be defaulted for any *one* breach, regardless of whether past breaches had been waived or ignored. In light of our holdings in Sections I and II of this decision, this paragraph may be of particular importance.

The letter advising Yochums of termination, sent March 29, 1971, stated, *inter alia,* that the taxes were delinquent in the amount of $1,326.21. For this and other defaults, discussed above, Pierces demanded the entire contract price. It is clear from the record that at the time this letter was written, there was a total of only $478.32 due on the property taxes. Viewing the evidence most favorable to the Yochums,

it also appears that this remaining delinquency was paid in full on June 29, 1971.

Whatever remedial action was taken by the Yochums, it is inescapable that when the letter of termination was sent there was a default in that the property taxes were not properly paid. There can be little dispute as to the contract language. The Yochums were to keep the taxes "current," which, in its usual sense, would mean that taxes should be completely and timely paid. It is also clear, from paragraph 18, that a failure to pay the taxes would be grounds for termination of the contract. It is at this point, faced with a flood of unyielding facts, that Yochums rely on numerous equitable arguments. We need consider, however, only those arguments specifically applicable to the issue of property tax default.

The only arguments applicable are: (1) that a past history of Pierces' accepting irregular payments waives any right to forfeit without first giving notice that prompt payment would be required, and

(2) that a forfeiture would be unconscionable under the doctrine established by our Supreme Court in *Skendzel* v. *Marshall* (1973), 261 Ind. 226, 301 N.E.2d 641.

In light of the *Skendzel* decision we approach the issue of forfeiture with caution, mindful of avoiding inequitable results. This general approach to such cases is suggested by the following language from *Skendzel,* at page 650:

> ". . . we are compelled to conclude that judicial foreclosure of a land sale contract is in consonance with the notions of equity developed in American jurisprudence. A forfeiture—like a strict foreclosure at common law—is often offensive to our concepts of justice and inimical to the principles of equity. This is not to suggest that a forfeiture is an inappropriate remedy for the breach of all land contracts. In the case of an abandoning, absconding vendee, forfeiture is a logical and equitable remedy. Forfeiture would also be appropriate where the vendee has paid a minimal amount on the contract at the time of default and seeks to retain possession while the vendor is paying taxes, insurance, and other upkeep in order to

preserve the premises. Of course, in this latter situation, the vendee will have acquired very little, if any, equity in the property. However, a court of equity must always approach forfeitures with great caution, being forever aware of the possibility of inequitable dispossession of property and exorbitant monetary loss. *We are persuaded that forfeiture may only be appropriate under circumstances in which it is found to be consonant with notions of fairness and justice under the law."* (Emphasis added.)

After reading the above conclusions in, the Supreme Court entered an order of foreclosure, to be governed by applicable rules and statutes regarding mortgage foreclosures.

Inasmuch as we have found that Yochums did in fact become delinquent on their taxes in 1971, an order for judicial foreclosure might seem appropriate here, especially in light of our findings that the Yochums were not otherwise in default. However, after a close consideration of the contract and actions of the parties, we have concluded that foreclosure of any type would be inappropriate.

As indicated by the records kept by Dr. Pierce, it was the rule, rather than the exception, to accept irregular payments. There is some evidence in the record that late payments were also accepted with regard to property taxes, to-wit; the following exchange between counsel for the Pierces and Mr. Yochum:

"Q. You stated that you were not aware that you were delinquent in taxes at March 29, 1971?
A. That's right. When I received a letter from Dr. Pierce.
Q. You were not aware of your delinquents?
A. No, sir.
Q. Weren't aware that you were some thirteen hundred dollars ($1300.00) delinquent?
A. No, sir.
Q. *This isn't the first time you were delinquent, is it?*
A. *No, but I paid them, Paul."* (Emphasis added.)

We have not found, and Pierces have not pointed out, any record of a demand for delinquent or late taxes prior to the letter of March 29, 1971. It is Pierces' contention, however,

that a failure of prior demand does not affect the demand made in 1971. Pierces rely on paragraph number sixteen, set out above. Pierces argue that this provision gives them the power to declare default after any breach regardless of whether past breaches have been permitted. It is contended that should this court ignore such a provision, the integrity of all written contracts would suffer.

This court has not ignored the written words of the contract at hand. However, where a particular provision is in dispute, neither can we ignore the conduct of the parties with relation to that provision. In light of the conduct noted above, and the language of the provision at issue, we find the following language from *Chambers* v. *Boatright* (1961), 132 Ind. App. 378, 387, 177 N.E.2d 600 persuasive:

> "Appellants, however, persist in their view and further say in their brief: 'the appellees by their agreement also agreed that the Waiver by the Appellants of any default should not constitute a waiver of any subsequent default upon their part.' We do not find that the contract contains such provision. The contract contains a provision that if any taxes, assessments or insurance premium be not paid when due, or if any installment of the purchase price or interest thereon, shall become delinquent for a period of five (5) days, or if the buyer shall fail to observe or perform any other conditions or terms of the contract, the seller may '*at his option*' *cancel the agreement*, take possession of the real estate, etc., 'without any notice or demand whatsoever, the necessity therefor being hereby expressly waived,' etc. and said contract further provides: 'Failure or delay of the seller to exercise *any option* hereunder . . . shall not operate as a waiver of the right of the seller to *exercise such option* for the same or any subsequent default at any time thereafter.' There is no provision in the contract that we can find that a waiver by appellants of any 'default' does not constitute a waiver of any subsequent 'default' by appellees. As pointed out in *South Side State Bank* v. *Snyder, supra,* the contract contains 'an option' in appellants but this was 'only an option' that 'had not been exercised.'" (Original emphasis.)

Chambers was another case involving a land contract, where the sellers had accepted irregular amounts at irregular times.

In the case at bar, Pierces had an "option" to declare default that was not exercised prior to 1971; although, with regard to the taxes, there is evidence that such an option *could* have been invoked. We are of the opinion that once Pierces accepted late payments on the taxes *without protest or notice of required prompt payment in the future,* the provision that the taxes be kept "current" had been waived. Further, as the failure to protest *past* late payments may have induced Yochums into believing that similar late payments would be accepted without consequence, we conclude that said waiver would continue until such time that Yochums were notified that prompt payment would be required. *Carr* v. *Troutman, et al.* (1954), 125 Ind. App. 151, 123 N.E.2d 243. The March, 1971, letter to Yochums was *not* a notice that all delinquencies be cured and that future strict compliance would be required. Rather, the letter stated that there *was* in fact a breach and that the contract was terminated. *Under the facts of this case* we find it ". . . consonant with notions of fairness and justice . . ." that the contract remain in full force and effect. *Tidd* v. *Stauffer* (1974), 159 Ind. App. 570, 308 N.E.2d 415; *Rembold Motors, Inc.* v. *Bonfield* (1973), 155 Ind. App. 422, 293 N.E.2d 210.

We wish to emphasize that we do *not* hold that land contracts can never be forfeited. See, *Skendzel, supra.* We hold only that the failure to exercise an "option" does not also negate the fact that a past breach occurred, and that no action was taken with reference thereto. To hold otherwise would allow paragraph sixteen to operate as a constant modification of the conduct of the parties within the contractual framework.

## IV.

In concluding this opinion, we deem it necessary to comment on an increasingly prevalent appellate practice.

We wish to caution attorneys against an incomplete recitation of facts in appellate briefs. In our adversary system, it

is obvious that different facts will be cited by different parties to sustain their various arguments. This procedure we expect and support. However, we find it disturbing that too often phrases or parts of testimony are lifted from context to support a particular argument. This procedure we do not condone. We realize that not all of what one witness may say will be supportive, and that, therefore, not all of the testimony will be included in the brief. However, when testimony is included in the brief it should be set out *as it is in the record.* Also, in the "facts portion of the brief, personal opinion or comment should be kept to a minimum, if necessary at all. See, Code of Professional Responsibility, Ethical Considerations 7-19, *et seq.*

We do not here accuse the attorneys in the case at bar of deliberately altering the record. We simply wish to enlist all attorneys in assisting this court in a fair and *expedient* administration of justice.

Judgment affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 330 N.E.2d 102.