**ADULT GROUP PROPERTIES, LTD., et al, Appellants (Defendant Below),**

v.

**Richard IMLER and Mary Ann Imler, Appellees (Plaintiff Below).**

No. 48A02–8604–CV–124.

Court of Appeals of Indiana, Fourth District.

March 24, 1987.

Rehearing Denied April 29, 1987.

---

John M. Blevins, Michael C. Ice, Anderson, for appellants.

Michael R. Withers, Anderson, for appellees.

CONOVER, Presiding Judge.

Defendant-Appellant Adult Group Properties, Ltd., et al. (AGP) appeals the trial court's granting of a permanent injunction enjoining AGP from building a structure for the developmentally disabled in a residential subdivision.

We affirm.

ISSUES

AGP presents two issues for our review. Restated, they are

1. whether the trial court erred by finding a residential subdivision's restrictive covenants lawfully could be invoked to prohibit construction of a residential facility for developmentally disabled or mentally ill persons which was to be operated as a commercial enterprise in violation of those covenants; and

2. whether the trial court erred by finding the proposed use was non-residential and multi-family.

FACTS

Extension Heights is a subdivision of the city of Anderson, Indiana. The plat of the subdivision, duly recorded in 1960, contains restrictive covenants regarding use and occupancy of the lots therein. Covenants numbered one and two provide

1) LAND USE AND BUILDING TYPE: No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single family dwelling not to exceed two and one-half stories in height . . .

2) ARCHITECTURAL CONTROL: No building shall be erected, placed, or altered on any lot in the subdivision until the building plans, specifications, and plot plans showing the location of such building have been approved in writing by the directors of the Board of Church Extension and Home Missions of the Church of God.

(R. 31). The covenants also provided they were to run with the land.

Appellees Richard and Mary Ann Imler (Imlers) purchased lot number one in Extension Heights in 1960. Theirs was the first home in this subdivision. The covenants were important to the Imlers when they purchased the lot. The covenant providing subdivision lots would be used for residential purposes only was one of the reasons they bought a lot there instead of elsewhere.

Much later, DEVCO Mortgage Company (DEVCO), an Ohio corporation, AGP's nominal party, acquired title to lot number two bordering the Imlers' lot. On October 22, 1985, DEVCO conveyed lot two to AGP, an Ohio limited partnership. DEVCO is in the business of erecting and operating residential facilities for developmentally disabled or mentally ill persons in residential subdivisions throughout the state as a commercial enterprise.

The architect for DEVCO contacted Mr. Imler on December 12, 1985, the evening of the day a contractor removed the top soil from lot two preparatory to beginning construction of AGP's proposed facility. The architect told Imler he did not believe he needed the Church Board's permission to put the proposed business there, the cove-

nants had nothing to do with whether or not it could be so placed. He further told Imler the structure would be used for a business purpose.

The subdivision's covenants also provided for their enforcement by way of injunction. The Imlers filed suit for injunction the next day and a restraining order then a temporary injunction issued against DEVCO and its real party in interest, AGP who had intervened. The temporary injunction prevented the erecting of the proposed facility until approval had been obtained from the Church Board. ·

When AGP received the Board's approval, the trial court after hearing, issued a permanent injunction against the erecting of the proposed facility because the covenants restricted the use of the subdivision's lots to residential purposes only, and AGP's proposed facility was a business enterprise.

AGP appeals.

DISCUSSION AND DECISION

Whether to grant or deny an injunction lies within the trial court's sound discretion. *City of Muncie v. Pizza Hut of Muncie, Inc.* (1976), 171 Ind.App. 397, 357 N.E.2d 735, 736. Unless it can be shown the decision of the trial court was arbitrary or an abuse of discretion, the court's judgment will not be disturbed. *Id.*

In reviewing a trial court's discretionary power to grant or deny an injunction, this court considers only the evidence which supports the trial court's judgment along with all reasonable inferences which may be drawn therefrom. *State ex rel. D.N.R. v. Mason* (1981), Ind.App., 416 N.E.2d 1312, 1315.

AGP argues certain Indiana statutes demonstrate a public policy to integrate the developmentally disabled and mentally ill into the various communities of Indiana. To support its position, AGP points to four Indiana statutes, namely, IND.CODE 16-13-22-1, 16-13-22-3, 16-13-21-12, and 16-13-21-14 which it claims support its position. Our reading of these sections reveals only two of them are relevant to the issues in this appeal.

The first two sections AGP cites deal with the planning and administration of community based residential alternatives to institutionalization of the developmentally disabled and mentally ill. The first provides facilities for such persons shall have a homelike atmosphere. The second requires placement of program participants in programs which are the least restrictive consistent with their individual needs. Neither section deals with the location of such facilities in residential areas. The remaining two, however, touch that subject matter.

IC 16-13-21-12 says

Zoning ordinances adopted under IC 36-7 may not exclude *a residential facility for the developmentally disabled* from a residential area *solely because the residential facility is a business* or because the persons residing in the residential facility are not related, unless the residential facility will be located within three thousand feet (3,000) of another residential facility, as measured between lot lines.... (Emphasis supplied),

and IC 16-13-21-14 reads in pertinent part

Any restriction, ... or covenant in any subdivision plat, ... pertaining to, the ... use of property that would permit the residential use of property but *prohibit the use of that property as a residential facility for the developmentally disabled or mentally ill persons*, is, *to the extent of the prohibition*, void as against the public policy of the state. (Emphasis supplied).

Two things are markedly different between these two sections, namely, (a) facilities for mentally ill persons may be excluded by local zoning ordinances in residentially zoned areas, and (b) the emphasized language in Section 12 or words of similar import allowing commercial operation of facilities for the developmentally disabled and mentally ill persons in residential subdivisions protected by restrictive covenants do not appear in Section 14. Nothing indicates such language was omitted from Section 14 through inadvertence or mistake. We further note Sections 12 and 14 of IC 16-13-21 were passed during the same ses-

sion of the legislature and on the same day. Thus, the question is did the legislature intend such facilities could be built and operated as business enterprises in subdivisions protected by covenants restricting use of lots therein to residential purposes only?

I.

## A. *Rules of Construction*

 When construing statutes, our foremost concern is to determine and give effect to the true intent of the legislature. *Frame v. South Bend Community School Corp.* (1985), Ind.App., 480 N.E.2d 261, 263. Statutes which relate to the same thing or general subject matter are *in pari materia* and should be construed together. *Citizen's Action Coalition of Indiana, Inc. v. NIPSCO* (1985), Ind., 485 N.E.2d 610, 617. *Wright v. Gettinger* (1981), Ind., 428 N.E.2d 1212, 1219; *Matter of Lemond* (1980), 274 Ind. 505, 413 N.E.2d 228, 245, n. 15; *U.S. Steel v. NIPSCO* (1985), Ind.App., 486 N.E.2d 1082, 1085; *Johnson v. La-Porte Bank & Trust Co.* (1984), Ind.App., 470 N.E.2d 350, 354–355; *Ind. State Hw'y. Comm'n. v. Bates & Rogers Constr., Inc.* (1983), Ind.App., 448 N.E.2d 321, 323–324. Also, laws passed at the same session of the legislature relating to the same subject matter are *in pari materia* and should be construed together, especially when they are approved on the same day. *Obermeyer v. Indianapolis Lien & Credit Co.* (1968), 251 Ind. 382, 241 N.E.2d 252, 254. All statutes relating to the same subject matter should be so construed with reference to each other that effect may be given to all the provisions of each, if this can be done by any fair and reasonable construction, so as to produce a harmonious system, if possible. *Ware v. State* (1982), Ind.App., 441 N.E.2d 20, 22–23.

 Statutes passed on the same day or at the same session, when related to the same subject, are presumed to be actuated by the same policy. It is proper to construe them together, as parts of one body of laws, and as together expressing legislative will. *Combs v. Cook* (1958), 238 Ind. 392, 151 N.E.2d 144, 147; *Olszewski v. Stodola* (1948), 226 Ind. 639, 82 N.E.2d 256, 257; *Holle v. Drudge* (1920), 190 Ind. 520, 524–525, 129 N.E. 229. We are to determine the intent of the legislature in this regard by considering each section of this Act with reference to all other sections and the legislature's apparent motive for leaving out wording in IC 16–13–21–14 which would permit the location and operation of business enterprises of this nature in residential areas protected by restrictive covenants. *Combs*, 151 N.E.2d at 147. In construing a statute, it is just as important to recognize what a statute does not say as it is to recognize what it does. *Van Orman v. State* (1981), Ind.App., 416 N.E.2d 1301, 1305; *State ex rel. Schuerman v. Ripley County Council* (1979), Ind.App., 395 N.E.2d 867, 870.

## B. *The Covenants Prevail*

A careful reading of IC 16–13–21 demonstrates a legislative intent to treat cases where business enterprises seek to establish residential facilities for the developmentally disabled in residentially zoned areas differently from cases involving the commercial placement of such facilities in real estate subdivisions where commercial activities are prohibited by covenants restricting the use of lots therein to residential uses only, as in this case. Under Section 12, zoning ordinances may not exclude such facilities "solely because the residential facility is a business...." Section 14 attempts to render void as against public policy restrictive covenants which permit residential use of property but prohibit use of subdivision property "as a residential facility for the developmentally disabled or mentally ill persons...." That section, however, contains no language authorizing such facilities to be placed therein when they are to be operated as business enterprises.

When a commercial establishment of this nature seeks to do business in a subdivision whose covenants restrict lot use to residential purposes only, the legislature intended the restrictive covenants were to prevail. Were it otherwise, words permitting the location of such businesses in cove-

nant-protected subdivisions would appear in IC 16–13–21–14. It is important for us to recognize what a statute does not say, as well as what it does. *Van Orman,* and *State ex rel Schuerman, supra.*

▪ Also, we must presume the legislature intended to pass a constitutional act since a statute is presumed to be constitutional in the first instance. When a statute may be construed so as to support its constitutionality, we must adopt such construction. *U.S. Steel,* 486 N.E.2d at 1085; *Miller v. State* (1983), Ind.App., 449 N.E.2d 1119, 1121.

### C. *Restrictive Covenants Are Contract Rights*

▪ Generally, a covenant imposing an affirmative burden will run with the land if (1) the covenantors intended it to run, (2) the covenant touches and concerns the land, and (3) there is privity of estate between subsequent grantees of the original covenantor and covenantee. *Moseley v. Bishop* (1984), Ind.App., 470 N.E.2d 773, 776. A restrictive covenant creates a property right in each grantee and subsequent grantees. *Pulos v. James* (1973), 261 Ind. 279, 302 N.E.2d 768, 771; *Wischmeyer v. Finch* (1952), 231 Ind. 282, 107 N.E.2d 661, 664. The purpose of a restrictive covenant is to maintain or enhance the value of lands pertinent to one another by controlling the nature of the surrounding lands and the uses to which they are put. *Bob Layne Contractor, Inc. v. Buennagel* (1973), 158 Ind.App. 43, 301 N.E.2d 671, 678. While restrictive covenants are not judicially favored, they will be equitably enforced if they are set out without ambiguity and are not violative of public policy. *Buennagel,* 301 N.E.2d at 678; *Bachman v. Colpaert Realty Corp.* (1935), 101 Ind.App. 306, 194 N.E. 783, 787. Covenants restricting business activity are not violative of public

policy. *Ferris v. American Brewing Co.* (1900) 155 Ind. 539, 58 N.E. 701, 702.

▪ The restrictive covenants here were duly recorded with the subdivision's plat in 1960. Their recording constituted notice to the world of their contents. *Wischmeyer v. Finch* (1952), 231 Ind. 282, 107 N.E.2d 661, 663; *Vierk v. Ritenour* (1961), 131 Ind.App. 547, 172 N.E.2d 679, 683. When the first lot was sold, the covenants became binding. They could not thereafter be modified or extinguished without the consent of all the lot owners in the subdivision. *Wischmeyer,* 107 N.E.2d at 664. These restrictive covenants created a property right in the Imlers, and the property right they acquired cannot be taken for a private use. *Pulos,* 302 N.E.2d at 771.

▪ To construe Section 14 as authorizing commercial enterprises such as AGP to build and operate such facilities in contravention of the subdivision's covenant restricting the lots therein to residential use only, would make the statute unconstitutional because it would violate Article I, Sections 21 and 23 of the Indiana Constitution,[1] and the due process clause of the Fourteenth Amendment to the United States Constitution.[2] *Pulos,* 302 N.E.2d at 771. Thus, we must interpret this section as making the restrictive covenants enforceable against AGP and its proposal to operate a business on lot 2 in violation of the subdivision's covenants to make the section constitutional. *U.S. Steel, supra,* and *Miller, supra.*

▪ Finally, interpretation is required also to prevent a violation of Article I, Section 24 of the Indiana Constitution, which provides

No *ex post facto* law, or law impairing the obligation of contracts, shall ever be passed.

The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

---

**1.** Article I, Section 21 provides:

No man's particular services shall be demanded, without just compensation. No man's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered.

and Article I, Section 23 provides:

**2.** The Fourteenth Amendment reads in part

Nor shall any state deprive any person ... of property, without due process of law.

and Article I, Section 10 of the United States Constitution which reads, in part

No State shall ...; pass any ... Law impairing the Obligation of Contracts, ...

The legislature may not impair previously legal contracts after rights thereunder have vested. *Supreme Council Catholic Knights of America v. Logsdon et al* (1915), 183 Ind. 183, 108 N.E. 587, 592.

### D. Covenants Do Not Violate Equal Protection Clause

Finally, AGP claims the situation here is identical to that found in *Shelley v. Kraemer* (1948), 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. In *Shelley*, a restrictive covenant barred occupancy of lots in a subdivision by members of the Negro race. The United States Supreme Court found enforcement of such a covenant by state courts would constitute state action in violation of the equal protection clause of the Fourteenth Amendment. *Shelley*, 334 U.S. at 20, 68 S.Ct. at 845.

■ It is readily apparent the covenants here discussed do not violate the equal protection clause. These covenants neither directly nor by necessary implication prohibit occupancy of the lots in the subdivision by developmentally disabled or mentally ill persons for residential purposes in structures meeting the requirements of the subdivision's building restrictions. Only business uses are prohibited. In this regard, the *Shelley* court said

It should be observed that these covenants do not seek to proscribe any particular use of the affected properties. Use of the properties for residential occupancy, as such, is not forbidden. The restrictions of these agreements, rather, are directed toward a designated class of persons and seek to determine who may and who may not own or make use of the properties for residential purposes. The excluded class is defined wholly in terms of race or color; "simply that and nothing more."

*Shelley*, 334 U.S. at 10, 68 S.Ct. at 840. Thus, AGP's argument on this point is without merit.

The trial court did not err by entering the permanent injunction.

### II. Trial Court's Definition of "Family" Correct

AGP next contends the trial court erred by defining the word "family" as used in the restrictive covenants to mean persons related by blood or marriage. In support of its argument, it cites 660 IAC 3-1-4. That section says

FAMILY is an individual or two or more persons related by blood or marriage and/or a group of not more than eight persons (excluding servants) who need not be related by blood or marriage living together in a dwelling unit.

That definition formerly was part of the Indiana Building Code. It was not in effect in 1960, nor is it in effect now. This section of the code was repealed effective January 1, 1985.

■ Because the restrictive covenants here created fixed contract rights in the Imlers and other subsequent grantees when lot 1 in Extension Heights was conveyed to them in 1960, the meaning of the word "family" as used in the covenants also became fixed at that time. The date of the contract usually controls its obligations. *Free v. Haworth* (1862), 19 Ind. 404. Thus, it was incumbent upon the trial court to determine the precise meaning of the word at that time.

We find the following language clearly states the rule when covenants are to be construed:

Where the language of a covenant is unambiguous, clear, and specific, the rule, similar to that adopted in the construction of statutes, is that no room is left either for interpretation or for construction. Otherwise, however, the paramount rule for interpretation of covenants so to expand them as to give affect to the actual intent of the parties, *as of the time the covenant was made,* and as collected from the whole instrument construed in connection with the circumstances surrounding its execution, with a view to support, rather than to defeat, the instrument. Nothing should be read

into the language of the covenant extending its meaning beyond what its language fairly imports.... The language of a covenant must be read in an ordinary or popular, and not in a legal or technical, sense. It has been said that technical words should be construed as they are understood by scientific men and mechanics acquainted with the business in regard to which the covenant is made; but, since *intent, and not words, is the essence of every agreement,* it would seem that such words are to be construed, if possible, to effectuate the intent of the parties, and hence, according to their accustomed meaning as used and understood by the community at large, and unless the circumstances and context indicate that a different meaning is intended. (Emphasis supplied).

21 *Corpus Juris Secundum, Covenants* § 20, 896–897.

▇▇▇ The trial court, applying the above principles, defined the term family, saying

"Family" implies father, mother and children, immediate blood relatives. *Collins v. Northwestern Casualty Co.,* [180 Wash. 347] 39 P.2d 986.

(R. 16). The construction of a written contract is generally a question of law for the court's determination. *Kordick v. Merchants National Bank and Trust Co.* (1986), Ind.App., 496 N.E.2d 119, 125; *Ancich v. Mobil Oil Co.* (1981), Ind.App., 422 N.E.2d 1320, 1321–1322. Nevertheless, if reasonable men would find the contract susceptible to more than one construction, ambiguity exists. *Kordick, Ancich, Id.; Kleen Leen, Inc. v. Mylcraine* (1977), 174 Ind.App. 579, 369 N.E.2d 638.

▇▇▇ The trial court correctly treated this question as a mixed question of fact and law. Wherever the intent of the parties to a contract is not spelled out, and the evidence is conflicting, the issue as to their intent is a question of fact. *Hearst Corp. v. Cuneo Press, Inc.* (C.A.7, Ind.1961) 291 F.2d 714, 720. A contract is ambiguous when reasonable persons would find its terms subject to more than one interpretation. *Midwestern Indemnity Co. v. Leffler Construction Co.,* (1984), Ind.App.,

463 N.E.2d 1130, 1133; *R.R. Donnelley & Sons, Co. v. Henry-Williams, Inc.* (1981), Ind.App., 422 N.E.2d 353, 356. If the terms of a contract are ambiguous, it is the responsibility of the trier of fact to ascertain the *facts* necessary to construe the contract. *Midwestern Indem. Co., Id.; Indiana Industries, Inc. v. Wedge Products* (1982), Ind.App., 430 N.E.2d 419, 423.

It is readily apparent reasonable persons could have differed as to the meaning of the term in question at the time the covenants became binding in this case. Defining the term, Black's Law Dictionary reads in part,

**FAMILY.** The word is used to designate many relationships. (Citing cases).

In broad or primary sense "family" means: a collective body of any two persons living together in one house as their common home for the time; (citing case) a collective body of persons, living together in one home, in a permanent and domestic character, under one head or management, (citing case); a collective body of persons who live in one house and under one head or management, (citing case); a group of blood-relatives; all the relations who descend from a common ancestor, or who spring from a common root, (citing case); a group of kindred persons, (citing case); husband and wife and their children. (Citing case).

In most common use, the word implies father, mother and children, immediate blood relatives. (Citing case).

In narrow or restricted sense "family" means: a father, mother, and children, whether living together or not, (citing case); group of parents and children founded on principle of monogamy, (citing case); husband and wife and their children, (citing case).

In ordinary conversation, the word is descriptive of a person's wife and children. (Citing case).

In restricted sense, the word "family" may be used interchangeably with household. (Citing case).

In secondary meaning, "family" means those who are of the same lineage, or

descend from one common progenitor. (Citing case).

*Black's Law Dictionary*, Revised 4th Edition, West Publishing Co. (1968). Because the term "family" can mean different groups of persons in different factual settings, the trial court correctly first determined *factually* which of the several definitions of that term applied in the factual setting before him. Having done so, he then construed the covenants as a matter of law for the court. *Midwestern Indem. Co.; R.R. Donnelley & Sons, Co., supra.*

Where there is uncertainty, obscurity or ambiguity in the language of a contract, the acts of the parties in connection therewith furnish valuable aid in the construction of it.

> [E]vidence of the mutual acts of the parties to the contract in reference to the fulfilment of it, after it was entered into, is admissible to show what their intention and understanding was in the use of language otherwise somewhat obscure.

*Ketcham et al v. Brazil Block Coal Co.* (1883), 88 Ind. 515, 529; *Pierce v. Yochum* (1975), 164 Ind.App. 443, 330 N.E.2d 102, 107. In this regard, there was evidence before the trial court that thirty-four of the thirty-five lots in the subdivision had been developed as one family residences. (R. 420). Further, a real estate expert testified in his opinion, the use contemplated by AGP would be a change of use from that of single-family to multi-person occupancy, its proposed project would not be a single family residence in this particular case. (R. 436–437).

Thus, the trial court's determination the word "family" as used in the restrictive covenants meant "father, mother and children, immediate blood relatives" is supported by substantial evidence of probative value.

We find no error.

Affirmed.

NEAL, J., concurs.

MILLER, J., dissents with separate opinion.

MILLER, Judge, dissenting.

I dissent. If our courts persist in excluding family-type residential units from the definition of a "single family dwelling", then the elderly, the developmentally disabled, the retarded, the physically handicapped, and foster children—all of whom, with minimal help, could live in a family setting with the normal patterns and conditions of everyday life—must be confined to nursing homes and institutions, in some cases permanently, where no family atmosphere is present.

In *Metropolitan Development Commission of Marion County v. The Villages, Inc.* (1984), Ind.App., 464 N.E.2d 367, *trans. denied, cert. den.* (1985), 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171, our Third District found a proposed group home in which a married couple would act as foster parents for up to ten abused, abandoned, and neglected foster children did not constitute a single-family dwelling, nor did the group home qualify as an accessory use under the zoning ordinance. In Judge Ratliff's vigorous dissent, he correctly noted the proposed use met the definition of a single-family residence as clearly established by decisions from our sister states.

In the case decided today, the majority finds a family unit of six to eight developmentally disabled adults and two supervisors is a commercial enterprise, in clear contravention of the public policy of this state as defined by our legislature, and also finds the restrictive covenant prevails over the statutes at issue which were enacted under the legislature's plenary policy power.

On the other hand, this District recently recognized that a group home for developmentally disabled adults was a residential use. In *Metropolitan Board of Zoning Appeals v. Gunn* (1985), Ind.App., 477 N.E.2d 289, a homeowner appealed from an order by the Zoning Appeals Board which granted a special exception for establishment of a group home for developmentally disabled adults within a historic preservation area in Indianapolis. The landowner argued that, by statute, the Meridian

Street Preservation Commission had the power to veto the proposed group home as a special exception to the zoning ordinance. This court held the Preservation Commission did not have veto power over special exceptions, but did have veto power over variances which, if granted, might change the nature of the neighborhood. This court noted that the proposed group home for developmentally disabled adults was defined by statute as a "residential facility", I.C. 16–13–21–1, and reasoned as follows:

"We also deem our conclusion to be consonant with general public policy. '[T]he ultimate purpose of zoning regulations is to confine certain classes of uses and structures to certain areas.' *Misner v. Presdorf* (1981), Ind.App., 421 N.E.2d 684, 686. Thus, it is proper for a municipal authority to designate certain areas as 'residential' and to 'restrict those uses which would conflict with a stable, uncongested single-family environment.' *Incorporated Village of Freeport v. Association for the Help of Retarded Children* (1977), 94 Misc.2d 1048, 406 N.Y. S.2d 221, 222. In the obverse, then, a municipal authority may *authorize* those uses which maintain such a residential environment.

*A group home has such a 'generic' quality of residential ambience because its purpose is to so provide the qualities of a stable and permanent household to the developmentally disabled. Incorporated Village of Freeport v. Association for the Help of Retarded Children* (1977), 94 Misc.2d 1048, 406 N.Y.S.2d 221, 222. What Gunn asks that we do is make a distinction among households based upon intimate or genetic relations rather than land use control. This, we believe, is inappropriate. *See, e.g., Hessling v. City of Broomfield* (1977), 193 Colo. 124, 563 P.2d 12.

The legislature has spoken clearly on the subject of 'main-streaming' developmentally disabled adults into normal family environments rather than having them institutionalized. *See* IND. CODE 16–10–2.1–1 (1982), *et seq.* (now IND. CODE 16–13–21–1 *et seq.*) The policy is clear. The Meridian Street preservation act, on the other hand, controls the land use policy in a specific Indianapolis neighborhood by giving the inhabitants thereof a modicum of self-determinism regarding the manner in which the complexion of their locale may or may not be changed by variances from its essentially residential character. The policy therein is not one of controlling the character of the households except in denominated single and double-family dwellings. If one such dwelling is granted a recognized exception to be labeled a group home, neighboring inhabitants are not empowered to prevent it on the basis of the lack of familial relationship. The trial court erred as a matter of law in finding otherwise." (emphasis added).

*Gunn, supra,* 477 N.E.2d at 299–300.

In my opinion, first, this family-type unit is residential, not commercial. Second, it does not violate either the residential use restriction or the building-type restriction contained in the subdivision's restrictive covenants. Third, even if the restrictive covenant had been so specific as to exclude this type of group home, which is not the case here, our courts should not enforce a restrictive covenant that is in opposition to the legislatively defined public policy in this area.

I. *Restrictive Covenant* [1]

After examining the language of the restrictive covenant, I conclude the majority forces ambiguity where it does not exist. The language of the covenant is clear:

"1) LAND USE AND BUILDING TYPE: No lot shall be used except for *residential purposes.* No building shall be erected, altered, placed or permitted to remain on any lot other than *one detached single family dwelling not to*

---

**1.** In my opinion, as expressed later, the restrictive covenant here involved cannot be enforced by our courts as it is clearly against public policy. However, the impact of the majority

opinion on similar group homes, i.e. the elderly, is so severe I must attack the majority opinion's reasoning and conclusions.

*exceed two and one-half stories in height ..."*
(emphasis added).

This covenant contains two types of restrictions, one limits land use to "residential purposes" and the other limits the type of building to "one detached single family dwelling not to exceed two and one-half stories in height."

### A. *Land Use Restriction*

The initial question is whether the proposed group home for six to eight unrelated developmentally disabled persons and two house parents violates the restriction against any use "except residential purposes." Giving these words their plain and ordinary meaning, a "residential purpose" is one in which people reside or dwell, or in which they make their homes.

Residential use is distinguishable from commercial or business use. The language of the restriction is concerned with the physical activity carried on upon the premises, and not with the presence or absence of a profit-making motive on the part of the landowner. The fact that a residential facility may be owned for income producing purposes does not make the *use* of the premises a *use* for business or commercial purposes. *See Brennen v. Kos* (1983), 15 Mass.App. 513, 446 N.E.2d 1082 (language of restrictive covenant that "only one-family house shall be erected hereon" did not prevent homeowners from renting rooms in their house to college students, but, rather, restricted number and types of structures which could be constructed on each lot that was subject to covenant); *Walker v. Gross* (1972), 362 Mass. 703, 290 N.E.2d 543 (use of premises for an apartment building with 83 family units was not prevented by a deed restriction which provided no part of premises could be used for "any business purpose" because apartment apartment building was used by its occupants for residential purposes). *See also Blakely v. Gorin* (1974), 365 Mass. 590, 313 N.E.2d 903.

I find the occupants of the proposed structure will use it for residential purposes, as required by the restrictive covenant. The inhabitants of the proposed residential facility are to be six to eight developmentally disabled adults and two house parents who would live together as a household, maintaining the home, preparing meals, and performing housekeeping chores. The underlying theory behind establishing such a home is that it serves as a surrogate family arrangement. This home will be neither a boarding house nor an institutional facility.

Faced with similar factual situations, a substantial number of our sister jurisdictions have held that the operation of a group home is a residential use within the meaning of a covenant with such a restriction. *See, e.g., Linn County v. City of Hiawatha* (1981), Iowa, 311 N.W.2d 95; *Clark v. Manuel* (1985), La., 463 So.2d 1276, 1279; *Concord Estates v. Special Children's Foundation* (1984), La.App., 459 So.2d 1242, 1244; *Vienna Bend Subdivision Homeowners Asso. v. Manning* (1984), La.App., 459 So.2d 1345; *St. Luke's House, Inc. v. DiGiulian* (1975), 274 Md. 317, 336 A.2d 781; *City of Livonia v. Department of Social Services* (1985), 423 Mich. 466, 378 N.W.2d 402; *Leland Acres Home Owners Assoc. v. RT Partnership* (1981), 106 Mich.App. 790, 308 N.W.2d 648; *Malcolm v. Shamie* (1980), 95 Mich.App. 132, 290 N.W.2d 101; *Bellarmine Hills Assoc. v. Residential Systems Co.* (1978), 84 Mich.App. 554, 269 N.W.2d 673; *Costley v. Caromin House, Inc.* (1981), Minn., 313 N.W.2d 21; *Blevins v. Barry Lawrence County Asso.* (1986), Mo., 707 S.W.2d 407; *State ex rel Region II Child and Family Services, Inc. v. District Court* (1980), 187 Mont. 126, 609 P.2d 245; *Knudtson v. Trainor* (1984), 216 Neb. 653, 345 N.W.2d 4; *Berger v. State* (1976), 71 N.J. 206, 364 A.2d 993; *J.T. Hobby & Son, Inc. v. Family Homes, Etc.* (1981), 302 N.C. 64, 274 S.E.2d 174; *Beres v. Hope Homes, Inc.* (1982), 6 Ohio App. 3d 71, 453 N.E.2d 1119; *Jackson v. Williams* (1985), Okla., 714 P.2d 1017; *Crowley v. Knapp* (1980), 94 Wis.2d 421, 288 N.W.2d 815. *See generally* Annot., Restrictive Covenant Limiting Land Use to "Private Residence" or "Private Residential Purposes": Interpretations and Application, 43 A.L.R. 4th 71 (1986); Annot., Community Residence for Mentally

Disabled Persons as Violation of Restrictive Covenant, 41 A.L.R. 4th 1216; (1985) Annot., Use of Property for Multiple Dwellings as Violating Restrictive Covenant Permitting Property to be Used for Residential Purposes Only, 99 A.L.R. 3d 985 (1980); Guernsey, The Mentally Retarded and Private Restrictive Covenants, 25 Wm. & Mary L.Rev. 421 (Spring 1984); Brussack, Group Homes, Families, and Meaning in Subdivision Covenants, 16 Ga.L.Rev. 33 (Fall 1981).

In *Blevins v. Barry Lawrence County Association, supra,* Missouri homeowners sought to enjoin the County Association for Retarded Citizens from using its property as a group home for eight mentally retarded and unrelated adults. The subdivision was protected by a restrictive covenant which provided in relevant part:

"1. The aforesaid real property shall be used for *residential purposes only.* No buildings shall be erected, altered, placed or permitted to remain on said real property other than *single or double family dwellings not to exceed two and one-half stories in height* and private garages for not more than two cars. No detached structures shall be permitted." (emphasis added).

*Blevins,* 707 S.W.2d at 407. The Missouri Supreme Court, sitting *en banc,* held the covenant established both a use and a structural restriction. The Court stated its reasons for holding that a group home is a residential use as follows:

"[Appellant] operates a number of 'group homes' in which mentally retarded adults live in a residential setting with 'house parents', often a husband and wife, who provided supervision and care for the retarded adults. . . .

The group home as contemplated to be operated by in Wildwood Estates by defendant is designed to allow the residents to develop their social, emotional and intellectual skills by living in a stable family-type environment. The house parents and residents function in an integrated family-style unit instead of as independent individuals who share only a place to sleep and eat. Residents are involved in performing simple household duties and participate in discussing, and if possible, resolving problems existing in the home and in making decisions as to the nature of group activities. Although ultimate decisions are left to house parents and/or the defendant's board. The entire group often attends church, goes shopping and travels about the community in a body.

. . . [F]ormal training for the retarded residents does not take place in the group home, but rather is conducted at an activity center or sheltered workshop during the workweek. Within the group home, the house parents encourage the development of social skills and simple homemaking skills by the individuals living there. The primary purpose of a residential group home is to provide a living situation as normal as possible for developmentally disabled residents of the community and is ordinarily not a temporary living arrangement but, depending upon the individual, a resident may remain in the group home months, years or for their entire lifetime."

*Blevins,* 707 S.W.2d at 408.

In *Jackson v. Williams, supra,* Oklahoma homeowners sought an injunction against a non-profit organization attempting to establish a group home for five mentally handicapped adult women. The homeowners argued the group home violated a restrictive covenant which provided in part:

"All lots in the tract shall be known and described as *residential lots * * * * No structure shall be erected, altered, placed or permitted to remain on any building plot other than *one detached single-family dwelling.*"
(emphasis added).

*Jackson,* 714 P.2d at 1021. The Oklahoma Supreme Court held the covenant established both a use and a structural restriction, "the first sentence . . . requires lots to be residential; the rest of the covenant requires that any structure be a single-family dwelling." *Jackson,* 714 P.2d at 1021. The Court held the proposed group home violated neither provision of the restrictive

covenant and explained its holding that a group home is a residential use of property:

"It is the purpose and method of operation which serves to distinguish the proposed residential use of the home from that normally incident to a purely commercial operation. Financial gain is clearly not the motivation of the Association in the operation of the home.

The five women are to function as single housekeeping unit by sharing in the preparation of meals, performing housekeeping duties and planning recreational activities. Most of the women have outside employment. The housekeeper will provide supervision and guidance similar to that of the head of any household. The day-to-day activities occurring at the home, as viewed from the outside, will not make it appear unlike the rest of the neighborhood. The essential purpose of the group home is to create a normal family atmosphere dissimilar from that found in traditional institutional care for the mentally handicapped. The operation of a group home is thus distinguishable from a use that is commercial—i.e., a boarding house that provides food and lodging only—or is institutional in character. Furthermore, no educational training would be provided at the home nor would there be medical or nursing care administered to the residents. In virtually all respects, save for the mental capacity of those who would live in the home, the on-the-premises operations would be much like a typical surburban household.

*Jackson v. Williams, supra,* 714 P.2d at 1022.

I conclude the group home at issue here is residential and does not violate the use restriction contained in the covenant.

### B. *Building Type Restriction*

The next question is whether Adult Group Properties' intended use of the property violates the second sentence of the restrictive covenant which limits building type to "one detached single family dwelling not to exceed two and one-half stories in height." Imler's argue this restriction is a restriction on use and that Adult Group Properties' proposed residential facility is not a single family dwelling. By its plain terms, however, this restriction applies only to structures and not to the use of the property. Read literally and in harmony with the first restriction on use, "single family dwelling" restricts the number and types of structure which can be erected and maintained on each of the lots subject to the covenant. The words "single family dwelling" indicate a manifest intent that a residence erected upon the lot should be limited in design to the accommodation of a single family unit, precluding the erection of a single building containing two or more wholly distinct apartments. *See Lebo v. Fitton* (1942), 71 Ohio App. 192, 41 N.E.2d 402.

The covenant at issue here closely resembles those in *Blevins, supra* and *Jackson, supra. Blevins* held the group home did not violate a provision in a restrictive covenant limiting building type to "single family dwelling" because "single family dwelling" applies only to structures, not to use of the property. The *Jackson* court reached the same conclusion and explained its reasons as follows:

"The term 'family' was, in fact, used without a definition and hence did not necessarily exclude from its meaning a group of unrelated persons living together in a home. This phrase was intended to describe the character of the structure rather than limit the use of the property to single-family residence. When, as here, the restrictive covenant under consideration prohibits occupancy of more than one family unit but does not address itself to the composition of the family, a court is loathe to restrict a family unit to that composed of persons who are related, one to another, by consanguinity or affinity."

*Jackson,* 714 P.2d at 1023.

I find the size and shape of the building proposed to be erected conforms to the restriction on building type. A number of our sister jurisdictions have reached a similar conclusion, whether interpreting a restrictive covenant or a zoning ordinance, and held that certain group homes may be

a "family" unless an explicit definition of family contained in the covenant or ordinance dictates otherwise. *See, e.g., City of Santa Barbara v. Adamson* (1980), 27 Cal.3d 123, 164 Cal.Rptr. 539, 610 P.2d 436 (a restrictive definition of "single family dwelling" would violate state constitution); *Oliver v. Zoning Commission of Town of Chester* (1974), 31 Conn.Sup. 197, 326 A.2d 841; *Douglas County Resources, Inc. v. Daniel* (1981), 247 Ga. 785, 280 S.E.2d 734 (broad definition in ordinance); *Linn County v. City of Hiawatha* (1981), Iowa, 311 N.W.2d 95; *Malcolm v. Shamie* (1980), 95 Mich.App. 132, 290 N.W.2d 101; *Costley v. Caromin House, Inc.* (1981), Minn., 313 N.W.2d 21; *State ex rel Region II Child and Family Services, Inc. v. District Court* (1980), 187 Mont. 126, 609 P.2d 245; *Knudtson v. Trainor* (1984), 216 Neb. 653, 345 N.W.2d 4 (adopting trial court opinion which quoted with approval a broad definition of "family"); *State v. Baker* (1974), 81 N.J. 99, 405 A.2d 368 (restrictive definition would violate state constitution). *Saunders v. Clark County Zoning Dept.* (1981), 66 Ohio St.2d 259, 421 N.E.2d 152; *Gregory v. State Dept. of Mental Health* (1985), R.I., 495 A.2d 997; *Mongony v. Bevilacqua* (1981), R.I., 432 A.2d 661; *Collins v. City of El Campo* (1984), Tex.App., 684 S.W.2d 756; *Crowley v. Knapp* (1980), 94 Wis.2d 421, 288 N.W.2d 815.[2]

I find no ambiguity in the plat restrictions and conclude Adult Group Properties' proposed use and building are permitted by the covenant. However, if the deed restriction did contain ambiguity, it is the obligation of this court to construe such ambiguity in favor of the grantee and in favor of the free use of the property. In property law, a "restrictive covenant" describes a contract between the grantor and the grantee which restricts the grantee's use and occupancy of land. Generally, the purpose behind restrictive covenants is to maintain or enhance the value of lands

adjacent to one another by controlling the nature and use of surrounding lands. *Pulos v. James* (1973), 261 Ind. 279, 302 N.E.2d 768; *Burnett v. Heckelman* (1983), Ind.App., 456 N.E.2d 1094; *Cunningham v. Hiles* (1979), 182 Ind.App. 511, 395 N.E.2d 851. Although restrictive covenants are not favored by the law, the contractual nature of the restrictions contained in such covenants has compelled the courts to enforce them in equity as long as the restrictions are unambiguous and do not violate public policy. *Burnett, supra; Ellis v. George Ryan Co., Inc.* (1981), Ind. App., 424 N.E.2d 125; *Kuchler v. Mark II Homeowners Assoc., Inc.* (1980), Ind.App., 412 N.E.2d 298. Our sister jurisdictions have long held it is the duty of their courts to construe ambiguity in a restrictive covenant in favor of the grantee and in favor of the free use of land, as long as this general rule is not used to ignore or override the specific language of the restrictive covenant. *Amoco v. Realty Company v. Montalbano* (1985), 133 Ill.App.3d 327, 88 Ill. Dec. 369, 478 N.E.2d 860; *Cimino v. Dill* (1982), 108 Ill.App.3d 782, 64 Ill.Dec. 315, 439 N.E.2d 980; *Freehling v. Development Management Group* (1979), 75 Ill.App.3d 243, 30 Ill.Dec. 610, 393 N.E.2d 646; *Lebo v. Fitton, supra; Stone v. Pillsbury, supra.* Although no specific Indiana authority has been found for this general rule, I would apply it here to resolve any ambiguity in favor of the grantee and the free use of the land in question.

## II. *Statutory Public Policy and Impairment of Contract Rights*

### A. *Construction of the Statute*

I believe the majority opinion, by designating the group home a business under our statute, violates two basic rules of statutory construction: if the language of a statute is not ambiguous, it needs no con-

---

**2.** Cf. *Macon Assoc. for Retarded Citizens v. Macon-Bibb County Planning and Zoning Commission* (1984), 252 Ga. 484, 314 S.E.2d 218 (explicit definition of "family" controlling); *Omega Corp. of Chesterfield v. Malloy* (1984), 228 Va. 12, 319 S.E.2d 728 (group home was not a single family because of supervision by counselors who were government employees). *See also,* Annot., What Constitutes a "Family" Within Meaning of Zoning Regulation or Restrictive Covenant, 71 A.L. R.3d 693 (1976); Scott, A Psycho-Social Analysis of the Concept of Family as Used in Zoning Laws, 88 Dick.L.Rev. 386 (1983).

struction, *Community Hospital of Anderson and Madison County v. McKnight* (1986), Ind., 493 N.E.2d 775; *M & K Corp. v. Farmers State Bank* (1986), Ind.App., 496 N.E.2d 111 and, when examining statutes, our foremost concern is to determine and give effect to the true intent of the legislature. *Frame v. South Bend Community School Corp.* (1985), Ind.App., 480 N.E.2d 261. Both the language chosen by the legislature in the following subsections and the other provisions in Chapter 21 on the same general subject matter[3] show the legislature's obvious purpose: to encourage licensed and supervised provision, by qualified private persons, of residential housing facilities and services needed for developmentally disabled and mentally ill persons within the state. The Legislature recognized that both zoning ordinances and restrictive covenants could be used by homeowners to delay or block placement of residential facilities in residential neighborhoods and make effective implementation of the State's policy of deinstitutionalization impossible. The purpose of the zoning and restrictive covenant provisions at issue here includes elimination of litigation adversely affecting the State's program of deinstitutionalization by challenging the "residential use" or "family" status of a group home.

The Legislature, in enacting Chapter 21, has determined that "mainstreaming"—bringing the handicapped back into the community where they can live more "normal" lives—is a worthy goal. Chapter 21 affirmatively fosters and supports community placement when such placement is appropriate and institutionalization is not beneficial. Institutionalization as an alternative is substantially more expensive and considerably less desirable for disabled residents. Chapter 21 clearly establishes that the public policy of this state is to promote the development and maintenance of quali-

ty programs and facilities for the care and treatment of the mentally and developmentally handicapped. Residential facilities are essential to the State's effort to end inappropriate placement of mentally disabled persons in large institutions and to provide homes for mentally disabled persons who have never been institutionalized. State licensed residential facilities allow mentally disabled persons to lead reasonably full lives and to avoid being committed to almost complete dependency in a state institution. The Legislature provided, in I.C. 16–13–21–12 and I.C. 16–13–21–14, that developmentally disabled and mentally ill persons needing community residential care may not be excluded from the benefits of living in normal family residential neighborhoods by either zoning ordinances or restrictive covenants. The Legislature recognized that both zoning ordinances and restrictive covenants could be invoked to block or delay placement of community residential facilities and make impossible the effective implementation of the State's policy of deinstitutionalization.

I.C. 16–13–21–12 reads:

"Zoning ordinances adopted under IC 36–7 may not exclude a *residential facility for the developmentally disabled* from a residential area *solely because the residential facility is a business or because the persons residing in the residential facility are not related,* unless the residential facility will be located within three thousand feet (3,000) of another residential facility, as measured between lot lines." ... (Emphasis added).

I.C. 16–13–21–14 reads in pertinent part:

"Any restriction, ... or covenant in any subdivision plat, ... pertaining to, the ... use of property that would permit the residential use of property but *prohibit the use of that property as a residential facility for the developmen-*

---

3. We note the goals of the legislature in establishing standards for the licensure of residential facilities for the developmentally disabled or mentally ill:

"16–13–21–10 Standards for Licensure
Sec. 10. The state standards for licensure of residential facilities under this chapter must, to the extent feasible, *assure that the resi-*

*dential facilities simulate a home-like atmosphere for residents. Residents must have available to them the patterns and conditions of everyday life that are as close as possible to the normal patterns and conditions of individuals who are not developmentally disabled.* (emphasis added).

*tally disabled or mentally ill persons,* is *to the extent of the prohibition,* void as against the public policy of the state." (Emphasis added).

Zoning ordinances under I.C. 16–13–21–12 are not permitted to prohibit the location of residential facilities because these facilities might be labeled a business or because the residents are unrelated.[4] Subdivision plats and deeds under I.C. 16–13–21–14 are not permitted to prohibit the location of residential group homes because the use of the property might be labeled as not residential. The legislature's intent is plainly to encourage the development of residential facilities for developmentally disabled and mentally ill persons in a variety of neighborhoods throughout our state. We note the zoning section expressly provides that one residential facility may not be located within 3,000 feet of another. This section precludes excessive concentration of residential facilities in any one neighborhood and protects homeowners from any detriment which may result from such concentration.

Even if the use or the building proposed for the property violated the restrictive covenant, this court should not equitably enforce the covenant because of a strong public policy favoring the establishment of such residences for the developmentally disabled and mentally ill. Over the past twenty years, this state has developed a policy favoring the deinstitutionalization of mentally and developmentally disabled persons and their placement in supervised residential facilities housing small groups of six to eight persons, commonly called a "group home". Chapter 21 authorizes the development, by private providers, and the licensing and supervision by the state, of residential facilities to be run in coopera-

tion with the Mental Health Department and the federal government. Chapter 21 strives to place developmentally disabled persons in normal settings, "a therapeutic environment in a home-like setting", I.C. 16–13–21–1, not in mental hygiene ghettos which will act as little more than mini-institutions grouped together in commercial areas.

The purpose of Chapter 21 is apparent: to provide the most effective care for mentally and developmentally disabled individuals in the least restrictive environment. The purpose of the statutory zoning and restrictive covenant provisions here at issue includes elimination of litigation adversely affecting the state's program by challenging the "residential use" or "family" status of a group home. In such circumstances, we must construe the act in question to suppress the evil and advance the remedy. Since the state's policy regarding placement of mentally ill and developmentally disabled persons would be frustrated by enforcement of the restrictive covenant, it cannot as a matter of public policy be enforced against the Adult Group Properties' proposed residential facility.

### B. *Impairment of Contract Rights*

The majority accepts the Imlers' argument that this court may not refuse to enjoin violation of the restrictive covenant on public policy grounds because it is a private contract which cannot be impaired by the state. I disagree. Although the language of the contract clause in our constitution is facially absolute[5] this court has recognized exceptions to the general rule. In *Wencke v. City of Indianapolis* (1982),

---

4. The majority construes the language of I.C. 16–13–21–12 as establishing, as a matter of law, that a residential facility is a business use. This construction is contrary to the intent of Chapter 21, which defines a group home for developmentally disabled adults as a "residential facility". *See* I.C. 16–13–21–1. A "residential facility" might have some features of a business when run for profit by private persons under the standards provided in Chapter 21 which encourage private development of residential

facilities. However, in my opinion, I.C. 16–13–21–12 is an attempt, however awkward, by the legislature to prevent a zoning ordinance from excluding a residential facility by labeling it a "business" or "commercial" use.

5. The Indiana Constitution, ART. 1 § 24 provides:

"No *ex post facto* law, or law impairing the obligation of contracts shall ever be passed."

Ind.App., 429 N.E.2d 295,[6] Judge Shields stated:

"A retrospective application of a statute to a contract entered into before the effective date of that statute can impair contractual obligations contrary to both the United States and Indiana Constitutions. U.S. Const. Art. 1 § 10; Ind. Const. Art. 1 § 24. There are, however, exceptions to the general rule. The prohibition against impairment of contracts is not an absolute one. The contract clause of either constitution does not restrict the exercise of the state's police power to protect the public health, safety, and welfare. *Finerty v. State ex rel. School City of Gary*, (1938) 213 Ind. 470, 12 N.E.2d 941. *In order to justify the impairment of a contractual obligation, there must be a necessity for the legislation and the legislation must be reasonable under the circumstances. In re La Fortune*, (9th Cir.1981) 652 F.2d 842." (emphasis added). *Wencke, supra*, 429 N.E.2d at 298.

This is the standard used by both the federal courts and our sister states in deciding whether legislative action has impaired the right to contract.

We recognize the impossibility of fully defining police powers. *Bruck v. State ex rel. Money* (1950), 228 Ind. 189, 91 N.E.2d 349. However, the term generally concerns the power inherent in government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society. *Id.* Police power, accordingly, operates in the field of legislation, except possibly in some cases of emergency. The State can exercise its police power to enact laws to control the use of property because the uncontrolled use

would be harmful to the general welfare. *See Williams v. State* (1983), Ind.App., 444 N.E.2d 888; *Foreman v. State ex rel. Department of Natural Resources* (1979), Ind.App., 387 N.E.2d 455.

In order to justify the impairment of a contractual obligation, there must be a necessity for the legislation and the legislation must be reasonable under the circumstances. Here, the state's interest in protecting the health, safety, and welfare of mentally and developmentally disabled persons is clearly an important public purpose and the means used by our legislature to encourage the development of residential facilities are reasonable and appropriate to effectuate the state's program of providing the most effective care in the least restrictive environment. I find the legislation reasonable because the use is residential and therefore conforms to the nature and character of a residential neighborhood.[7] The residents will use the home to live in, not to receive treatment. In these circumstances, the Imler's private contract rights may not override important legislatively defined state public policy.

Two of our sister jurisdictions have addressed the placement of group homes for the handicapped and have refused to enforce restrictive covenants because public policy prohibits such enforcement. The Court of Appeals of New York, in *Crane Neck Assoc., Inc. v. New York City/Long Island County Services Group* (1984), 61 N.Y.2d 154, 472 N.Y.S.2d 901, 460 N.E.2d 1336, *cert den.*, 469 U.S. 804, 105 S.Ct. 60, 83 L.Ed.2d 11, responded as follows to appellant's argument that the court may not refuse to enjoin violation of the restrictive covenant on public policy grounds because

---

6. In *Wencke*, this court held that the mandatory retirement age of 70 years provided by statute at the time an officer entered the police department was incorporated into the officer's contract of employment and therefore subsequent application by the City of Indianapolis of a later, lowered 65 year age limit constituted impairment of a contractual obligation in violation of both Federal and State constitutions. Judge Shields pointed out that, unlike here, there was no evidence that the legislature intended that reduction of the mandatory retirement age was an exercise of the state's policy power, nor did

the City establish the legislation was necessary to promote the public order, safety, health, or general welfare of the community. *Wencke, supra*, 429 N.E.2d at 298.

7. If this were a commercial use, such as a treatment center, nursing home, boarding house, clinic, or small hospital, I would have to consider and address the issue of whether the means used by the legislature were reasonable and whether the means reasonably effectuate the public purpose.

it is a private contract which cannot be impaired by the state absent emergency circumstances not present in that case:

"Although the language of the contract clause is facially absolute, this court has long recognized that the State's interest in protecting the general good of the public through social welfare legislation is paramount to the interests of parties under private contracts, and the State may impair such contracts by subsequent legislation or regulation so long as it is reasonably necessary to further an important public purpose and the measures taken that impair the contract are reasonable and appropriate to effectuate that purpose. (citations omitted).

While older cases such as [*Home Bldg. & Loan Assn. v.*] *Blaisdell* [290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413] (many of which concerned depression-era legislation prohibiting foreclosure of mortgages or other debts) may have suggested that some emergency requiring temporary State action should be present in order to allow impairment of contract rights, this is clearly no longer the law. 'If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem ... Furthermore, since *Blaisdell*, the court has indicated that the public policy need not be addressed to an emergency or temporary situation.' (citations omitted).

Here the State's interest in protecting the welfare of mentally and developmentally disabled individuals is clearly an important public purpose, and the means used to select the sites for community residences are reasonable and appropriate to effectuate the State's program of providing the most effective care in the least restrictive environment. In such circumstances, appellants' private contract rights may not override State policy.

Since public policy prohibits enforcement of the restrictive covenant against the 'community residence' at 3 Johns Hollow Road, appellants' action seeking to enjoin such use was properly dismissed."

*Crane Neck Assoc., supra,* 472 N.Y.S.2d at 908, 460 N.E.2d at 1339.

The Michigan Court of Appeals, in *McMillan v. Iserman* (1982), 120 Mich.App. 785, 327 N.W.2d 559, held a deed restriction specifically prohibiting the use of a lot for a residential facility for mentally impaired persons was unenforceable as contrary to public policy. The amended deed restriction at issue was a blatant attempt by homeowners to exclude any state licensed residential facility.[8] The court reasoned:

"We recognize the fact that it is the established public policy of this state to permit and uphold certain restrictions upon the use and occupancy of real property. (citations omitted). However, it is also the settled public policy of our state to promote 'the development and maintenance of quality programs and facilities

8. The amended deed restriction provided in pertinent part:

"3. No lot may be used for the operation of any state licensed residential facility, as that term is defined by Sections 125.216a, 125.286a and 125.583b of the Michigan Compiled Laws on January 1, 1980, such laws being more commonly referred to as M.C.L.A. Sections 125.216a, 125.286a and 125.583b. This restriction is to be liberally construed and is meant to exclude the operation of any State of Michigan-licensed facility that provides resident services for six (6) or less persons under 24–hour supervision or care for persons in need of that supervision or care, whether such residential facility is licensed pursuant to Public Act 287 of 1972, as amended, Public Act 218 of 1979, as amended, or pursuant to any

Public Act of the State of Michigan that may be adopted in the future which supersedes or amends Public Act 287 of 1972 or Public Act 218 of 1979 in any way.

4. No lot may be used for the operation of any business, enterprise, activity or service where the primary purpose of such business, enterprise, activity or service is to provide shelter, supervision and/or care to other persons in exchange for remuneration of any sort. This restriction shall not be interpreted so as to prevent any property owner within the Huron Woods Subdivision from renting or leasing his home to another person or persons, providing that the person or persons do not then use the home to provide shelter, supervision and/or care to other persons in exchange for remuneration of any kind."

for the care and treatment of the mentally handicapped'. (citations omitted) ... With two such competing public policies in the scales and being faced with having to make a choice, we find that the scales in this case tip decidedly in favor of protecting the state-licensed residential facility for the mentally handicapped. As Judge McGregor stated, dissenting in *Jayno Heights Landowners Ass'n v. Preston*, 85 Mich.App. 443, 454–455, 271 N.W.2d 268 (1978):

> 'In applying with the utmost caution the principle that restrictive covenants which violate public policy may not be enforced, I would find that the public policy favoring the establishment of residential adult foster care facilities outweighs the policy supporting the enforcement of residential restrictive covenants and that the covenant in question may not be enforced to enjoin defendants' use of this property as a licensed foster care facility. In reaching this result, it should be noted that the balance between the competing policies in this case is exceedingly close and that M.C.L. § 331.688(1); M.S.A. § 16.610(8)(1) serves to prohibit the excessive concentration of such facilities in any community. Residential homeowners are therefore protected from any detriments which may result from such a situation.'

We conclude that the amended deed restriction here, specifically prohibiting state-licensed residential facilities for the mentally handicapped, is manifestly against the public interest and thus unenforceable on public policy grounds."

*McMillan, supra*, 327 N.W.2d at 562.

In a later Michigan case, *Craig v. Bossenbery* (1984), 134 Mich.App. 543, 351 N.W.2d 596, property owners did not attempt so blatant an exclusion as the plaintiffs in *McMillan*. However, the covenant did provide a more specific definition of "single-family" than in our case:

> "Lots shall be used for residential purposes only and no building of any kind whatsoever shall be erected, re-erected, moved or maintained except private detached dwellings. Such dwellings shall be designated and erected for occupation by, and occupied by, only one (1) single family. A private garage or carport for the sole use of the owner or occupant may be provided. *A family shall mean one person or a group of two or more persons living together and inter-related by bonds of consanquinity, marriage, or legal adoption. The persons thus constituting a family may also include foster children, gratuitous guests and domestic servants.* The Declarant may permit the occupation of a dwelling by persons not constituting a family as defined herein provided it finds that such occupancy will not be detrimental to the purposes sought to be obtained by these restrictions."

(emphasis added).

*Craig, supra*, 351 N.W.2d at 597.

The Michigan Court of Appeals again found the public policy in Michigan strongly supports placing retarded citizens in normal community environments whenever possible and that this strong public policy precludes enforcement of the restrictive covenant. The court held:

> "The restrictive covenant we consider pre-dates the current controversy surrounding mainstreaming, whereas the *McMillan* covenant was written in direct response to the statute to specifically exclude group homes. We attribute no ill motive to our plaintiffs. Nevertheless, the public policies are the same. The strong public policy supporting group homes overcomes the public policy which favors the right of property owners to create restrictive covenants. We cannot consider the property owners' apparent motives in drafting or retaining a covenant lest we encourage indirect methods to exclude the handicapped where blatant, direct methods would clearly fail.
>
> Thus, we hold that the restrictive covenant which, by its definition of 'family,' bars the placement of a small group home for the continuous care of six or fewer mentally retarded adults is unenforceable as violative of public policy.

We are not striking down the covenant in its entirety. The Lake Oakland Woods Subdivision Number 3 has a recognized right to maintain the single-family atmosphere by defining 'family'. As applied to the residents of the defendants' small group home, however, the covenant is unenforceable."

*Craig, supra,* 351 N.W.2d at 599.

I conclude that the Imlers' private contract rights may not be permitted to override important legislatively-defined public policy and even if the proposed group home violated the restrictive covenant at issue, the court should refuse to enforce the restrictive covenant here on public policy grounds.