Charles M. HOWELL, et al.,
Appellants–Plaintiffs,

v.

Morgan HAWK, Appellee–Defendant
and Third Party Plaintiff,

and

Mark Snell, Appellee–Defendant,

v.

Russell Long, et al., Third
Party Defendants.

No. 39A04–0012–CV–521.

Court of Appeals of Indiana.

July 3, 2001.

 

Mark J. Dove, Rogers & Dove, North Vernon, IN, Attorney for Appellants.

Steven T. Williams, Williams, Joas & Stotts, Madison, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Charles M. Howell and ninety others (collectively, "Appellants") appeal the trial court's denial of their complaint for permanent injunction against Morgan Hawk and Mark Snell.[1] We affirm.

### Issues

We restate the sole issue Appellants raise as whether the trial court erred in its interpretation of the terms "mobile home" and "manufactured home" as they relate to a restrictive covenant in the parties' subdivision plat.

### Facts

All parties live in a Jefferson County subdivision known as College–Hill Addition. The plat of this subdivision was recorded on November 6, 1972, and, among other restrictive covenants, it contains the following covenant at issue in this case: "No Mobile Home Shall Be Placed On Any Lot." Record p. 116.

Hawk purchased a lot in College–Hill in early 1999. At the time she purchased the land, she was given a copy of the subdivision plat, and noted a covenant requiring that subdivision residences have a minimum of 1400 square feet. Because her disabled father was going to be living with her, she needed a single-level home with "a large open way" to accommodate his wheelchair or crutches. Record pp. 210–11. She visited "a number of different manufactured home developers" in Madison and other nearby towns, ultimately purchasing a 2100–square–foot, four-bedroom home from a business named "Long's Mobile Homes." *Id.* Due in part to her home's relatively large size, Hawk did not consider it to be a mobile home, but rather, a "manufactured" home. Record pp. 220–21.

On April 7, 1999, Appellants sued Hawk and Snell for a permanent injunction, complaining in part that Hawk "did in fact cause a mobile home to be placed upon Lot 60, College–Hill, in direct violation of the protective covenants...." Record p. 12. At a bench trial conducted August 30, 2000,[2] Appellants presented the testimony of several College–Hill residents, who gave eyewitness accounts of the preparations for and arrival of Hawk's home in the subdivision. These witnesses also opined as to the differences between Hawk's home and two or three "modular" homes in the subdivision, which they do not believe violate the restrictive covenant.

The Jefferson County assessor testified that her office assesses "mobile" and "manufactured" homes in the same manner. However, on cross-examination, she testified that in her office's training mate-

---

1. Snell, who apparently neither answered Appellants' complaint nor appeared for trial, is not a party to this appeal.

2. At the trial's beginning, Appellants filed their trial brief and moved for Special Findings of Fact and Conclusions of Law, which motion the trial court granted. We also note that as the trial began, Hawk dismissed her third-party complaint against Long's because they had filed for bankruptcy.

rials (which were introduced into evidence), "mobile" and "manufactured" homes are defined in two separate sections.

Appellants' witness Steve Miller, a licensed real estate broker who owns Brookside Estates, a mobile home park in North Vernon, testified that in his opinion the terms "mobile home" and "manufactured home" were synonymous. He also stated:

> [I]n the real estate business, most realtors really still look at a . . . at a double-sectioned mobile home or manufactured home, so be it, and would call it a modular. Well, that's not the case. A modular home is not supported by a steel chassis. It doesn't have a permanent steel foundation. . . . It comes in sections, and . . . and it's built to state and local codes, not the HUD code, and it's put on a permanent, concrete foundations, either a slab or a crawl or a basement. . . .

Record p. 191–92. Miller testified that the footer dug for Hawk's home, as shown in Appellants' Exhibit 2, was "exactly" like those dug in his mobile home park; he also likened the mobile homes in Brookside Estates to Hawk's residence due to their foundational similarities. However, on cross-examination, after showing Miller a photograph of Hawk's home, Hawk's counsel elicited the following testimony:

> Q: Can you state what the foundation looks like on the bottom of that home to you?
>
> A: Well, this is concrete block. It's either a foundation or it's either [sic] skirting. Without getting under the home, I wouldn't know. If it's a double-wide mobile home, then there's a steel frame under it that is the actual foundation. The concrete block wouldn't in this case . . . would probably just be

what they would call the skirting. You can have plastic or concrete skirting.

> Q: And if it's a modular home, what is that you're looking at?
>
> A: If it's a modular home, it's a foundation.
>
> Q: And you can't tell me either way with any degree of certainty, can you, sir?
>
> A: Not unless I inspected it more thoroughly.

Record pp. 202–03.

Hawk testified that although the business that sold her the home was called "Long's Mobile Homes," those who answered the phone at the business identified it as "Long's Manufactured Housing." Record p. 211. She was not present when the footer was dug for her home; nor was she present when it was installed and affixed to her property. She stated that her home presently has neither wheels nor plastic skirting under it, does not have a metal chassis underneath it, and is "permanently affixed" to the ground. Record pp. 237, 240.

The trial court entered its findings of fact and conclusions of law on September 8, 2000. In relevant part, the judgment reads as follows:

> 2. . . . Ms. Hawk was aware of the subdivision restrictions when she purchased her lot.
>
> 3. The home in which Morgan Hawk resides arrived on [her lot] in two separate sections, on wheels. The wheels and tongues were removed from the steel bases, the sections placed on a foundation, and the home was made weather tight and habitable. The home contains 2,100 square feet and is equipped with an access ramp to accommodate the needs of her physically handicapped father. In outward ap-

pearance, it is quite similar to some of the other homes in the subdivision.

4. At least two other homes in the subdivision were constructed off premises and brought to the site in two sections. Those homes were not the subject of litigation. Those homes were called "modular homes." They were distinguished from Ms. Hawk's home by one witness who called her home a "manufactured home" because it sat on a steel supported base[ ]. No one is claiming any "modular home" violated the restrictions of the subdivision.

5. The law looks with disfavor upon restrictive covenants. Fee simple absolute ownership is a darling of the common law. Restrictive covenants used to maintain or enhance the value of lands appurtenant to one another are not favored by the law, and will be construed most strongly against the restriction because there is, or at least has historically been, a public policy in favor of the free use of land. *See [Bachman v. Colpaert Realty Corp.*, 101 Ind.App. 306, 194 N.E. 783 (1935)]. The restrictions here create a negative equitable easement on the lots in College[-]Hill Addition.

6. The Plaintiffs are all owners of real estate in the College[-]Hill Addition and have standing to enforce the restrictions of that subdivision. The only issue is whether Ms. Hawk's home is a "mobile home" within the prohibition of those restrictions and, if so, what remedy should be afforded to the Plaintiffs.

7. In order to resolve this issue, the Court must decide whether the term "mobile home" as used in the plain language of the restriction of 1972 is broad enough to encompass the house placed on Ms. Hawk's lot in 1999.

8. It seems clear that a "modular home" does not violate the restriction, even though it may, like Ms. Hawk's home, arrive on the site in two sections. The only difference stated or shown is that her home rests on a steel base and a modular home does not. Driving past the two homes, a person could not tell the difference.

9. The Plaintiffs argue that a manufactured home that sits on a steel frame and can be transported on its own chassis fits the definition of a mobile home; the Defendant, Morgan Hawk, believes there is a distinction.

10. The Plaintiffs point out that 50 Indiana Administrative Code 2.2–8–1(5) in defining "manufactured home" states, "A mobile home built on or after June 15, 1976, may be referred to as a manufactured home." The logical fallacy of relying upon this statement is the same thing as stating, "Cats are animals. Therefore, all animals are cats." Some "manufactured homes" might well fit the definition of mobile home; others might not.

11. Applying the presumptions that the law requires be applied, the Court finds the difference between Ms. Hawk's home and the modular homes in the subdivision to be slight. However, the difference between her home and a mobile home as that term was used in 1974[sic] is considerable. A mobile home brings to mind a home on wheels, or a home at least capable of being pulled down a highway as a single unit. The Court does not find a 2,100 square foot home that, to outward appearances, is identical to other homes that do not violate the subdivision restrictions, is in violation of those restrictions.

12. No evidence was presented regarding the Defendant, Mark Snell, that differs from the evidence presented against the Defendant, Morgan Hawk.

13. The law is with the Defendants.

Record pp. 97–100. This appeal ensued.

### Analysis

■ Appellants challenge the trial court's denial of their motion for permanent injunction. The grant or denial of an injunction lies within the sound discretion of the trial court and will not be overturned unless it was arbitrary or amounted to an abuse of discretion. *Saurer v. Board of Zoning Appeals,* 629 N.E.2d 893, 896 (Ind.Ct.App.1994). We will reverse the trial court's judgment if the findings of fact are clearly erroneous. *Id.* Findings of fact are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id.*

■ However, at Appellants' request, the trial court entered findings and conclusions thereon in support of its judgment. When a party has requested special findings pursuant to Indiana Trial Rule 52(A), we apply the following two-tiered standard:

> the reviewing court must first decide whether the evidence supports the findings and second whether the findings support the judgment. The findings and judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. The judgment is clearly erroneous when it is not supported by the findings of fact and the conclusions of law entered on the findings. In making these determinations we shall neither reweigh the evidence nor judge witness credibility but consider only the evidence and the inferences flowing therefrom which are most favorable to the judgment.

*Castlewood Property Owners Ass'n, Inc. v. Trepton,* 720 N.E.2d 10, 12 (Ind.Ct.App. 1999) (citations omitted), *trans. denied* (2000).

■ Negative covenants such as the one here at issue call for the covenantor to refrain from doing some act. *Columbia Club, Inc. v. American Fletcher Realty Corp.,* 720 N.E.2d 411, 418 (Ind.Ct.App. 1999), *trans. denied* (2000). If the required performance limits the uses that can be made by the owner or occupier of land, the covenant is usually called a restrictive covenant. *Id.* We have held that restrictive covenants are, in essence, a form of express contract between a grantor and a grantee in which the latter agrees to refrain from using his property in a particular manner. *Id.*

■ One of the purposes of restrictive covenants is to maintain or enhance the value of land by controlling the nature and use of lands subject to a covenant's provisions. *Campbell v. Spade,* 617 N.E.2d 580, 584 (Ind.Ct.App.1993). As a general proposition, restrictive covenants are disfavored in the law, strictly construed by the courts, and all doubts should be resolved in favor of the free use of property and against restrictions. *Id.* (citing *Bachman v. Colpaert Realty Corp.,* 101 Ind.App. 306, 315, 194 N.E. 783, 787 (1935)). Because covenants are a form of express contract, we apply the same rules of construction; therefore, where the intent of the parties cannot be determined within the four corners of the document, a factual determination is necessary to give effect to the parties' reasonable expectations. *See Campbell,* 617 N.E.2d at 584.

### I. Statutory Definitions of "Mobile Home"

Appellants claim the trial court erroneously concluded that the restrictive covenant's term "mobile home" is ambiguous, and further erred by concluding that the nature of Hawk's home is not encompassed

by that term. The parties introduced several different statutes and Indiana Administrative Code provisions in an attempt to define "mobile home." Indiana Code Section 6–1.1–7–1, addressing property taxation of mobile homes, defines a mobile home as a "dwelling unit" that is "factory assembled," "transportable," "intended for year-round occupancy," "exceeds 35 feet" in length, and is "designed for transport on its own chassis" or for "placement on a temporary foundation." Indiana Code Chapter 16–41–27, entitled "Health, Sanitation, and Safety: Mobile Homes," provides the following definition:

> Sec. 4. As used in this chapter, "mobile home" means a vehicle, including the equipment sold as a part of a vehicle, that meets the following conditions:
>
> > (1) Is constructed for use as a conveyance upon public streets or highways by either self-propelled or not self-propelled means.
> >
> > (2) Is designed, constructed, or reconstructed, or added to by means of an enclosed addition or room, to permit the occupancy as a dwelling for at least one (1) person.
> >
> > (3) Is used and occupied as a dwelling.
> >
> > (4) Does not have a foundation other than wheels, jacks, skirting, or other temporary supports.

Appellants cite [3] *Adult Group Properties, Ltd. v. Imler,* 505 N.E.2d 459 (Ind.Ct.App. 1987), *trans. denied,* for the following proposition:

> [T]he paramount rule for interpretation of covenants [is] so to expound them as to give effect to the actual intent of the parties, as determined from the language used, the motives of the parties and the purposes they sought to accomplish.
>
> Intent should be determined *as of the time the covenant was made,* and as collected from the whole instrument construed in connection with the circumstances surrounding its execution, with a view to support, rather than to defeat, the instrument. . . .

*Id.* at 465 (citing 21 *C.J.S. Covenants* § 20 (now 21 C.J.S. Covenants, § 5 (1990))), (emphasis in *Imler*). We also note these general principles of construction:

> The language of a covenant must be read in an ordinary or popular, and not in a legal or technical, sense, unless the circumstances and context indicate that a different meaning was intended. . . .
>
> Where the language of a covenant is ambiguous, the construction placed thereon by the parties may properly be considered, and is the best evidence of their intention. . . .
>
> Covenants will be most strongly construed against the covenantor, at least where the terms used therein are equivocal.

21 C.J.S. Covenants § 5.

Although intent should be determined as of the time the covenant was made, the parties did not introduce any statutory or administrative language contemporaneous-

---

**3.** We ask Appellants' counsel to renew his acquaintance with the Bluebook and our Rules governing citation to cases. Appellants' brief almost completely lacks pinpoint citations within the relevant cases cited, and includes numerous blank (wholly superfluous) citations to the Indiana Appellate Court Reports (Ind.App.), which ceased to exist after 1979. We prefer to resolve cases on the mer-

its (*see, e.g., Wright v. Elston,* 701 N.E.2d 1227, 1231 (Ind.Ct.App.1998), *trans. denied* (1999)); nevertheless, we remind counsel that improper citation could amount to failure to make a cogent argument and result in waiver of our consideration of an issue, and such citation does not facilitate our review of the merits. *See id.*

ly in effect with the recording of the College–Hill plat. Our research reveals that the section of Indiana's property tax statute defining "mobile home" in effect in 1972 read as follows:

> A "mobile home" is hereby defined and declared to be any vehicle which is so constructed as to permit its being used as a conveyance upon public streets or highways by either self-propelled or nonself-propelled means, which is designed, constructed or reconstructed, or added to by means of an inclosed [sic] addition or room in such a manner as will permit the occupancy thereof as a dwelling or sleeping place for one or more persons, and which is both used and occupied as a dwelling or sleeping place having no foundation other than wheels, jacks, skirting, or other temporary support.

Ind.Code Ann. § 6–1–40–2 (1971). This definition was amended in 1973 to read more similarly to the present version (referenced above):

> A "mobile home" means a transportable, factory assembled dwelling intended for a year round occupancy, exceeding thirty-five [35] feet in overall length, and designed for transportation on its own chassis or placement on a temporary foundation.

Ind. Admin. Rules and Regulations[4] (6–1.1–7–1)–1 (Burns' 1976) (accompanied by an annotation indicating that the foregoing language was added in 1973 pursuant to Public Law 44). Subsequently, in early 1974, the State Board of Tax Commissioners appended the following regulation to the foregoing definition:

> A mobile home placed on real estate owned by the mobile homeowner or on a permanent foundation as is defined in

this regulation shall be deemed to be real property, assessed as such and subject to all laws applicable to real property assessment and taxation.

*Id.*

## II. Caselaw

■ We have not found, and the parties have not called to our attention, any Indiana case on point to guide our interpretation of these definitions and regulations as they pertain to Hawk's home. Our research reveals, however, that these questions have arisen with some frequency in other state courts, with equally uncertain results. The principles and reasoning relied upon by those state courts in factually similar situations may prove instructive in the instant case. *See generally* 83 ALR 5th 651 (Kemper, "What is 'Mobile Home,' 'House Trailer,' 'Trailer House,' or 'Trailer' Within Meaning of Restrictive Covenant") (discussing cases from thirty-one states, including one Indiana case involving a covenant restricting any "trailer or other structure of a temporary or movable character"). The article's summary and comment reads in relevant part as follows:

> When a dwelling manufactured and assembled off-site, such as a typical single-wide mobile home, is transported to property subject to restrictive covenants, the courts have had little difficulty in determining that the structure is within the meaning of the term "mobile home," "house trailer," or "trailer house," despite the fact that the mobile home's axles and wheels may have been removed and the mobile home may have been placed on a foundation.... In a few cases, dwellings other than a single-

---

4. This publication was the precursor to what is now known as the Indiana Administrative Code.

wide mobile home, which were manufactured without axles or wheels, have been placed on property subject to a restrictive covenant. It has been found that such a structure constituted a "mobile home" within the meaning of a restrictive covenant provision, but not a "trailer."

The courts have struggled in applying the terms "mobile home," "house trailer," "trailer house," or "trailer" to dwellings that were manufactured off-site and transported for assembly on-site. *These structures, often referred to as double-wide mobile homes or modular homes,* are in many cases constructed with materials equal or superior to those used in "stick-built" homes and, once completed, appear similar to conventional housing. In the majority of cases, the courts, often focusing on the manner in which these dwellings were brought to the restricted property, have held the completed structure to be within the meaning of a covenant restricting use of a "mobile home," "house trailer," or "trailer house" or a "trailer." *Nevertheless, the courts in a large number of cases have arrived at the opposite conclusion, usually finding that appearance or permanence of double-wide mobile homes or modular homes distinguished such structures from those intended to be restricted by covenants using the terms "mobile home," [etc.].*

83 ALR 5th 651, 662–63 (2000) (emphasis added).

Here, the trial court took the latter approach, finding the appearance and permanence of Hawk's home distinguished it from those the College–Hill covenant was intended to restrict. The court found that, "[d]riving past the two homes, a person could not tell the difference" between Hawk's home and other homes in the subdivision, and that because of its relatively large size and the fact that it "to outward appearances, is identical to other homes that do not violate the subdivision restrictions," it did not violate the covenant.

Reviewing these conclusions, we find them sound when measured against the overarching principles of construction: to determine intent "as of the time the covenant was made," and to read the language of the covenant "in an ordinary or popular, and not in a legal or technical, sense." 21 C.J.S. Covenants § 5. When the covenant was recorded in 1972, the term "mobile home" meant a "vehicle ... so constructed as to permit its being used as a conveyance upon public streets or highways...." *See* Ind.Code Ann. § 6–1–40–2 (1971). It was further defined as a structure "having no foundation other than wheels, jacks, skirting, or other temporary support." *See id.* The record reflects that Hawk's home has a permanent foundation rather than a temporary support. As far as appellants have shown, the term did *not* encompass a double wide, 2,100–square–foot structure placed upon a foundation. Rather than focusing upon the manner in which Hawk's home arrived at the subdivision, we find it appropriate to refer to the ordinary or popular sense of "mobile," and agree with the trial court that the term mobile home "brings to mind a home on wheels, or a home at least capable of being pulled down a highway as a single unit." Record p. 100.

We find persuasive Hawk's argument that the restrictive covenant at issue here could have been amended, had the residents of College–Hill so chosen, at any time between 1972 and 1999 when Hawk purchased her property there. A sort of evolution in the now-overlapping concepts of "mobile home," "modular home," and "manufactured home" has taken place since 1972, as evidenced by the Appellants' focus on the Indiana Administrative Code

provision stating, "A mobile home built on or after June 15, 1976, may be referred to as a manufactured home." Ind. Admin. Code 50–2.2–8–1(5). Had the Appellants wished to clarify the covenant so as to restrict any structure other than a so-called "stick-built" home, they had the means and the terminology at their disposal to do so. However, they instead permitted at least two other similar—so-called "modular"—structures to remain in the subdivision, and thereby did not clearly express their intent that a large, permanently affixed, double-wide structure such as Hawk's be considered violative of the restrictive covenant. Looking as we must to the intent of the parties as of the time the covenant was made, we find no error in the trial court's construction of it.

### Conclusion

In sum, whatever designation one chooses to assign to Hawk's home, the evidence in the record supports the trial court's finding that the meaning of the term "mobile home" as of 1972, when the College–Hill subdivision restrictive covenant was created, does not encompass the residence Hawk has affixed to her property there. We thus find no error in the trial court's denial of Appellants' motion to enjoin Hawk from keeping that residence in the subdivision.

Affirmed.

DARDEN, J., and NAJAM, J., concur.